K. Jay HOLDSWORTH and Dona S. Holdsworth, Plaintiffs-Appellees,

v.

Kline D. STRONG, Defendant-Appellant.

SECURITIES AND EXCHANGE COMMISSION, Amicus Curiae.

No. 75–1144.

United States Court of Appeals, Tenth Circuit.

Submitted July 8, 1976.

Decided Sept. 29, 1976.

Rehearing Denied Nov. 19, 1976.

Edwin S. Kahn, of Holland & Hart, Denver, Colo. (Clifford L. Ashton and Brent M. Stevenson, of Van Cott, Bagley, Cornwall &

McCarthy, Salt Lake City, Utah, on the brief), for defendant-appellant.

Harold G. Christensen, of Worsley, Snow & Christensen, Salt Lake City, Utah, for plaintiffs-appellees.

Harvey L. Pitt, Gen. Counsel, Paul Gonson, Assoc. Gen. Counsel, David J. Romanski, Asst. Gen. Counsel, Vernon I. Zvoleff, Atty., Washington, D. C., on the brief, for Amicus Curiae, Securities and Exchange Commission.

Before HILL, SETH, HOLLOWAY, McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

DOYLE, Circuit Judge.

Plaintiffs-Appellees prevailed in an action for rescission of a sale of stock. Appellant Kline D. Strong was found to have made the sale by using false representations and fraudulent devices. The suit was brought pursuant to Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Recovery was also obtained on a parallel claim in common law fraud.

The Holdsworths, husband and wife, sold their shares of stock in a closely held corporation called Sans-Copy to Strong, who had owned the majority of the stock in this corporation. Strong persuaded them to sell the stock, generally representing that the company was unable and would be unable to pay dividends. In truth, the company was continuously increasing its volume and had demonstrated earning capability.

The cause was tried to the court as an equity case, the Holdsworths' demand for a jury trial having been denied. It required four days to complete. At the end of the trial the judge announced from the bench that there was clear evidence of fraud and that Mr. Strong had violated Rule 10b–5 as well as all of the elements of a common law fraud case under the law of Utah. He then set forth his findings in oral form. These were later incorporated in a formal set of findings of fact and conclusions of law which were signed December 21, 1974. Strong did not seek a new trial nor did he challenge the findings and conclusions in the trial court. Instead he appealed at once to this court.

Both Kline D. Strong and the appellee K. Jay Holdsworth are attorneys; Holdsworth is an accountant as well. Paul Tanner, who was also a part of the enterprise in question, was and is an accountant. The mentioned parties formed the subject corporation. Its purpose was to develop, manufacture and sell time-keeping systems for law offices. Originally there were 60 shares of common stock which were divided equally among the three incorporators and their wives. Each couple paid $300 for 20 shares. It was contemplated at the outset that all three would participate in the management of the corporation. It did not work out as planned, however; Mr. Strong ended up in complete charge of the business. In its initial stages he performed research and other preliminary work developing the idea and introducing it to the legal profession. Essentially, it was a simple system for recording the time spent by lawyers working for clients.

In July 1959, Sans-Copy entered into an agreement with Reynolds and Reynolds granting to the latter the exclusive right to manufacture and market the system except in Utah. Under the agreement Sans-Copy was to receive a royalty of 30 percent on gross sales and Strong was to promote the time-keeping system at bar association conventions and meetings. It was as a result of this change of condition that the shares in the corporation were changed; Strong informed Holdsworth that since he was doing most of the work he believed that he should own a controlling interest. Holdsworth and Tanner agreed to this, and as a result Strong was given 52 shares of the 100 shares of the outstanding stock in the corporation.

The details of the Sans-Copy process is not of primary importance, but a brief description will help general understanding. It was and is a method for recording and keeping records of the time spent by a lawyer on a client's case. It furnishes a daily log as well as separate slips to be

sorted for use in determining bills. The system was intended to provide an easy way for lawyers to keep time sheets and to prevent double or triple entry accounting.

Strong was being paid compensation for his efforts, and Holdsworth and Tanner were given some shares of newly created stock which provided for them to get a small dividend annually. These dividends were paid irregularly in the Class A common stock until 1970, at which time they were abruptly terminated.[1]

After 1962, there were neither board meetings nor financial statements furnished to Holdsworth and Tanner. Holdsworth did not participate in the management of the corporation and his knowledge was restricted to information furnished by Strong.

In 1971, Strong notified Holdsworth and Tanner that the company had invaded capital in issuing 1970 dividends. For that reason, they were told that no dividends would be forthcoming at that time.

Holdsworth and Strong also owned a ranch, and subsequently, in January 1972, during the course of a conversation between Strong and Holdsworth having to do with the ranch, Strong offered to buy the Holdsworth shares for $1500. Strong at that time represented to Holdsworth that the corporation would never pay dividends in the future. He repeated this oral statement in a letter to the Holdsworths a short time later. Based on that statement and others, the Holdsworths sold their shares for $1500 and a general release. In the same year, Holdsworth learned that Sans-Copy had realized a gross income exceeding $100,000 and his knowledge moved them on May 17, 1973, to give notice of rescission. When Strong rejected this attempt, they started the present suit on May 31, 1973. Their claims were based on the following material misrepresentations and omissions (summarized and paraphrased hereafter):

Strong's statement that it was unlikely that dividends would be paid in the future; that the corporation was unable to pay present or future dividends on the preferred shares; omission by Strong to state material facts necessary to render the statements non-misleading; that at the end of the fiscal year ending November 30, 1971, Sans-Copy had gross receipts in excess of $96,000; gross receipts were increasing each year since 1969; Sans-Copy was a growing enterprise; deductions were unnecessarily excessive and improper and many of these were paid to Strong and his relatives; that Strong had borrowed from the corporation and not repaid the loans; furthermore, that the $1500 was an unfair price in light of the earnings of the corporation and its growth potential. It was also alleged that Strong had employed schemes and devices to defraud, had engaged in acts, practices and a course of business which had operated as a fraud and had breached his fiduciary responsibility to the Holdsworths, violating their special relationship of trust and confidence.

After a trial to the court, it was ordered that Strong return the common stock and the reversions in the Class A common stock to the Holdsworths.

## THE TRIAL COURT'S FINDINGS

In the trial court's findings of fact and conclusions of law it was brought out that the Holdsworths and Strongs were close friends and that this had been an important element in their entering into the enterprise. The trial court also considered some of the excessive expenditures which had been made by Sans-Copy to Strong's law firm. Excessive loans made to Strong from Sans-Copy funds were detailed. Amounts paid to Strong's immediate family and payment of personal expenses to Strong from the funds of Sans-Copy without approval or authorization of Holdsworth or Tanner

---

1. The Holdsworths submitted an exhibit which showed the following dividend payments on the Class A common stock:

| | | | |
|------|----------|------|----------|
| 1962 | $ 354.72 | 1966 | $1549.32 |
| 1963 | 805.36 | 1967 | 1233.83 |
| 1964 | 734.94 | 1968 | 243.76 |
| 1965 | 1576.23 | 1969 | 600.00 |
| | | 1970 | 1800.00 |

were pointed out as was payment of funds to Strong and his law firm in 1971 charged as attorney's fees but for which no legal services had been rendered.

The court also found that:

In 1970–71, the net worth of Strong was shown to have increased substantially; the defendant had misrepresented that there had been an invasion of capital in the payment of dividends in 1970.

There was in fact a surplus for that year. During 1971, Strong had diverted a large sum of money from Sans-Copy to a nonprofit corporation, Utah Law Research Institute, of which he was the organizer and executive director.

In 1971, defendant diverted funds from Sans-Copy to make restitution to the profit sharing plan of his law firm; no legal services were rendered to Sans-Copy for this payment of $4570.

During the year 1971, the net worth of appellant Kline Strong increased $262,000 which, after adjustments claimed by appellant, showed an increase of $112,000.

Notwithstanding the foregoing, the trial court found, appellant maintained that Sans-Copy was unable to pay dividends and would be unable to pay dividends in the future. Representations in Strong's letter to Holdsworth offering to buy him out were knowingly false statements relied on by the Holdsworths in accepting the offer to buy their stock.

The sale of the stock without examination of the books was held to be excusable in view of the friendly relationship of the parties, being engaged in the ranching business together as well as Sans-Copy. The books and records, according to the further finding of the court, failed to accurately reflect the condition of the company; they were incomplete and had been adjusted and revised by the defendant. So examination would not have been helpful in learning the truth.

The court determined that the evidence was clear and convincing that false representations were made by defendant concerning the present facts, which representations the defendant knew to be false and which representations were made for the purpose of inducing the plaintiffs to sell their stock and that the plaintiffs did sell their stock acting in reliance upon the representations made and in the belief that the representations were true.

The court's conclusions of law emphasized that the defendant knowingly and intentionally made false representations of present existing facts concerning the shares of stock of Sans-Copy for the purpose of inducing plaintiffs to sell their shares, and the plaintiffs sold their shares in reliance on the representations and that they acted reasonably under the circumstances of the case and the relationship of the parties and in ignorance of the falsity of the representations. The court concluded that there had been a violation of Section 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934, all of which entitled the plaintiffs to restitution.

## APPELLANT'S CONTENTIONS

On appeal Strong contends:

First, that the judgment based on Rule 10b–5 should be reversed because of the failure of the Holdsworths to exercise due diligence in selling their stock.

Second, that the judgment based on Rule 10b–5 together with the common law of fraud should be reversed because the Holdsworths did not suffer damage.

Third, that the judgment based upon common law fraud should be reversed because the Holdsworths were not justified in relying on Strong's statement.

Fourth, that the misrepresentations lacked materiality.

Inasmuch as the defendant does not challenge the general sufficiency of the evidence but rather bases his demands for reversal on alleged trial error, we address our comments to the specifics but, at the same time, note in passing that substantial evidence of intentional fraud and deceit is present.

## I.

### THE DUE DILIGENCE ISSUE

Strong's principal contention is that as a corporate insider, an attorney and accountant, Holdsworth was duty-bound to ascertain the corporation's financial status for himself prior to selling his stock. Instead, Strong asserts, the Holdsworths made no effort to investigate Sans-Copy's finances, notwithstanding that they had access to the corporate books and records. By strongly contending that Holdsworth should have diligently ascertained the truth, he seeks to shift the focus from his own intentional misrepresentations and omissions, which are not seriously disputed, to emphasis on alleged failures on the part of the Holdsworths to learn the truth.

The primary issue is, then, whether in an intentional fraud case such as the instant one, the victim is barred from relief if he does not exercise due care to avoid being deceived, due diligence being generally defined as the requirement that an insider "must fulfill a duty of due care in seeking to ascertain for himself the facts relevant to a transaction" before he may claim reliance on a material misrepresentation or omission. *Cf. Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 409 (3d Cir. 1974), citing cases.

 In *Clement A. Evans & Co. v. McAlpine,* 434 F.2d 100 at 104 (5th Cir. 1970), *cert. denied,* 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), the court defined due diligence in the course of the following quotation:

> We feel that step one of our test properly reflects these considerations as the objective standard of a reasonable investor exercising due care in light of all facts effectively imposes a duty of reasonable investigation. . . .

*Quoting, City National Bank of Fort Smith v. Vanderboom,* 422 F.2d 221, 230 n. 10 (8th Cir.) cert denied, 399 U.S. 905, 90 S.Ct. 2196,

26 L.Ed.2d 560 (1970). *See also Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 282 (2d Cir. 1975). Where the due diligence standard is applied it requires insiders or sophisticated investors who have access to information to take positive steps to ascertain the facts for themselves.

But it is important to note that the circuits which have imposed the due diligence requirement have done so in the context of the application to the *defendant* of a *negligence* standard. Examples of circuits which have ruled that proof of negligent misrepresentations was sufficient to constitute a violation of 10b–5 are: *White v. Abrams,* 495 F.2d 724, 730 (9th Cir. 1974); *Myzel v. Fields,* 386 F.2d 718, 735 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Kohler v. Kohler Co.,* 319 F.2d 634 (7th Cir. 1963). Our court has, on some occasions, imposed a "scienter or conscious fault" requirement.* *See Clegg v. Conk,* 507 F.2d 1351, 1361–1363 (10th Cir. 1974), *cert. denied,* 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975). If the negligence standard were being applied it might be appropriate to allow due diligence to be exacted from the victim, but where liability of the defendant requires proof of intentional misconduct, the exaction of a due diligence standard from the plaintiff becomes irrational and unrelated. On the other hand, if a defendant is being subjected to liability even when he has not knowingly misrepresented but has been negligent, it is not unreasonable to hold a plaintiff to a similar standard. 2 Bromberg, Securities Law: Fraud Section 10b–5, Section 8.4(652) (1974), states:

> It is noteworthy that the circuits which have most clearly charged defendant with constructive knowledge are, by and large, the same courts that have similarly charged plaintiff. There is a logic and balance in this. A high standard of conduct for defendant justifies a high standard for plaintiff. Stated a little differently, the price plaintiff pays for being

---

* It has also on occasion held that a negligence standard is sufficient. *See Financial Industrial Fund, Inc. v. McDonnell Douglas Corporation,* 474 F.2d 514 at 521 (10th Cir.), *cert. denied,* 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973).

relieved of the burden of proving defendant's intent or actual knowledge, is that plaintiff himself must show some diligence.

Thus, the limiting and narrowing of liability in the *negligent misrepresentation* case would be less illogical and the defense of due diligence tends in such a case to assume a more rational basis. *See* Comment, Negligent Misrepresentations Under Rule 10b–5, 32 Chi.L.Rev. 824, 841–42 (1965).[2] As we will see, however, this analysis is at present academic.

■ A significant clarification has taken place in this body of law as a result of the Supreme Court's recent decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Prior to this decision there had been a division in the circuits as to the need for proving scienter. *Ernst & Ernst, supra*, has settled this conflict by holding that proof of negligence is not enough in a 10b–5 action; that such an action will not lie in the absence of an allegation and proof of scienter, the same being an "intent to deceive, manipulate, or defraud." 425 U.S. 193, 96 S.Ct. at 1381. Ernst & Ernst, an accounting firm, periodically audited the books of a brokerage house, the president of which perpetrated a fraudulent securities scheme. Customers who had invested in this scheme sued Ernst & Ernst under Section 10(b) and Rule 10b–5, claiming that it had aided and abetted the fraud by its negligent failure to conduct efficient audits. The district court rejected this negligence theory and granted summary judgment in favor of Ernst & Ernst. In the court of appeals the cause was reversed, the appellate court holding that negligence was a proper basis for liability under Rule 10b–5. It said that if the fraud could have been discoverable or preventable in the absence of negligence, the accounting firm became liable. The Supreme Court disagreed. Its holding was that only intention-

al conduct of the defendant could give rise to a recovery under Rule 10b–5. The majority of the court said that the use by the framers of Section 10(b) of the words "manipulative or deceptive" in conjunction with "device or contrivance" effectively showed an intention to allow recovery only where intentional conduct was present. In addition to its reliance on the language of the Act and rule, the Court cited legislative history of the 1934 Act together with its relationship to the Securities Act of 1933.

■ The importance of *Ernst & Ernst* in the present case is that it calls for scrutiny of the defense of due diligence and prompts the question whether it applies to these facts even if it is applicable to more extreme circumstances. Since the plaintiff must prove his case in terms of the standard of scienter, doubts are cast on its usefulness where it allows the fraudulent actor to escape liability by saying that if the plaintiff had been diligent, he would not have allowed himself to be cheated. If plaintiff must prove scienter and at the same time the defendant is allowed to defend on this basis, the general effect on the remedy is of great magnitude and the action lies only in an extraordinary case. Even in the exceptional case the defendant would likely be able to demonstrate some lack of diligence on the part of the plaintiff. If contributory fault of plaintiff is to cancel out wanton or intentional fraud, it ought to be gross conduct somewhat comparable to that of defendant.

## II.

### THE COMMON LAW TORT ANALOGY

■ Another important result of the *Ernst & Ernst* decision is that it brings the standards for 10b–5 liability closer to the analogous tort of deceit or intentional misrepresentation. The analogizing to tort law

---

2. Notwithstanding the reasonableness and the balance of the negligence analysis, it should be noted nevertheless that it is a trap for the unwary plaintiff because it becomes harder for him to recover if he has to overcome his own lack of due diligence. He gives up more than he gains from having the easier standard of negligence on the part of the defendant. The overall result is a substantial narrowing of the civil remedy.

in fashioning standards for 10b–5 is instructive and useful. It is, in addition, supported by strong precedent. *See for example Straub v. Vaisman and Company, Inc.,* 590 F.2d 591 (3d Cir. filed June 15, 1976); *List v. Fashion Park, Inc.,* 340 F.2d 457 (2d Cir.), *cert. denied sub nom., List v. Lerner,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); 3 Loss, Securities Regulation 1759–1763, 6 Loss, pp. 3880Off; Comment, Negligent Misrepresentations Under Rule 10b–5, 32 Chi.L.Rev. 824, 828–33 (1965).[3] While, therefore, contributory negligence is logically related to negligence where the defendant is charged with negligent misrepresentation, and where he is charged with intent to defraud, mere contributory negligence of plaintiff becomes trivial in comparison. Prosser, Law of Torts, 4th ed. Section 107 states:

> [W]here there is an intent to mislead, it is clearly inconsistent with the general rule [footnote omitted] that mere negligence of the plaintiff is not a defense to an intentional tort. The better reasoned cases [footnote omitted] have rejected contributory negligence as a defense applicable to intentional deceit . . . .

Prosser, Section 108, p. 716.

Similarly, plaintiff is not duty-bound to investigate the truth or falsity of an intentional misrepresentation unless the misrepresentation is patently false. Restatement of Torts (1938) Sections 540, 541.[4] The Comment to Section 540 states that a person who has made a false statement about his financial condition may not defend on the ground that he offered to submit the books for inspection and that the offer was rejected. *See* Comment (a) to Section 540. Usually such an offer would not prevent the fraud anyway. Thus, where there has been intentional misrepresentation the common law does not exact a duty of due care or due diligence from the injured plaintiff.

██ Use of the tort analogy plainly demonstrates the inappropriateness of due diligence in 10b–5 suits under the *Ernst & Ernst* doctrine, for the due diligence standard as applied to 10b–5 suits is about the same as the application of contributory negligence. Just as contributory negligence is not a defense to an intentional tort case of fraud, similarly due diligence is totally inapposite in the context of intentional conduct required to be proved under Rule 10b–5.

Further support for this conclusion is found in the statutory language upon which the Supreme Court in *Ernst & Ernst* placed reliance in determining that the Act was meant to proscribe intentional conduct only. Nothing in the wording of either the statute or the rule suggests that a plaintiff is to be barred by failure to exercise due care or due diligence. Nor is there evidence that the framers of 10b–5 intended due diligence to be applicable any more than it had been applied to common law fraud.

██ We are not saying that once the plaintiff has proven scienter on the part of the defendant that he has discharged his requirements. Plaintiff must show that he relied on the misrepresentations and that the reliance was justifiable. Prosser, *op. cit.* Section 108; Restatement of Torts (1938) Section 541. And a plaintiff may not reasonably or justifiably rely on a misrepresentation where its falsity is palpable. This is another way of saying that the defendant's wrong must have been the cause of the plaintiff's harm. In the 10b–5 actions, as in common law fraud, there must exist this causal connection between the misrep-

---

**3.** The 10b–5 wrong is in nature and character a statutory tort in that it inflicts an injury of the same nature as a common law tort. The 10b–5 definitions are taken from the common law deceit definitions.

**4.** These sections are as follows:

Section 540: The recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

Section 541: The recipient in a business transaction of a fraudulent misrepresentation is not justified in relying upon its truth if its falsity is obvious.

resentation or nondisclosure and the plaintiff's injury.

## III.

## CAUSATION OR JUSTIFIABLE RELIANCE

The Second Circuit has held scienter to be an essential element in a civil action under Rule 10b–5. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith*, 495 F.2d 228, 238–239 (2d Cir. 1974). The scienter element here required furnishes a basic element of causal connection which imposes a limitation on the defendant's liability. *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1292 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). The causal relationship provided by proof of reliance or materiality sufficiently satisfies the need for causal link. *Titan Group, Inc. v. Faggen*, 513 F.2d 234 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975).

The Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), considered the reliance element in the 10b–5 action. Its decision was that where the deceit arose from nondisclosure, proof of reliance was unessential. A bank had purchased securities from a group of unsophisticated investors and had failed to disclose that the securities were being sold at a higher price in a market made by the bank. The court of appeals had ruled that the plaintiffs could not recover for failure to prove reliance. *See Reyos v. United States*, 431 F.2d 1337 (10th Cir. 1970). The Supreme Court reversed the Circuit Court and said:

> [u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. * * * This obligation to disclose and the with-

holding of a material fact establish the requisite element of causation in fact. 406 U.S. at 153–154, 92 S.Ct. at 1472.

Under the circumstances of that case, involving primarily a failure to disclose, the effect of the Supreme Court's ruling is, then, not to eliminate reliance as an element but rather to recognize the difficulty of proving reliance in a failure to disclose situation. In this nondisclosure situation, once causal connection is proven by showing materiality, that is to say, whether a reasonable investor would have considered the withheld facts important, *Affiliated Ute Citizens of Utah v. United States, supra; List v. Fashion Park, supra*, the reliance element is inferred. *Titan Group, Inc. v. Faggen, supra*, at 238–239; *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, supra*, at 239–40; *see generally*, Note, The Reliance Requirement in Private Actions Under SEC Rule 10b–5, 88 Harv.L.Rev. 584 (1975).

Where, as here, there are affirmative misrepresentations, the problem of proving reliance is not the same and reliance is the appropriate and decisive way to prove the chain of causation. *Titan Group, supra; see also* Note, 88 Harv.L.Rev. 584 (1975). Unquestionably the proof of reliance or materiality is essential to the case where it is a positive misrepresentation type of action and justifiable reliance is the required element. *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir. 1975) (semble). All of this, however, is quite different from superimposing on the plaintiff the standard of due care. Under that standard the plaintiff would not be heard to say that he relied on misrepresentations which were obviously false.

Our court also requires proof of causation as a condition to recovery. *See for example Financial Industrial Fund, Inc. v. McDonnell Douglas Corporation*, 474 F.2d 514, 517, 521 (10th Cir.), *cert. denied*, 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973) (plaintiff must "demonstrate reliance on the acts or inaction of the defendant"); *Clegg v. Conk*, 507 F.2d 1351 (10th Cir. 1974), *cert. denied*, 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669

(1975) ("something more by way of reliance or causation in fact than some abstract wrong expending its force entirely upon itself" is required). Reliance does not flow from a showing of some abstract wrong. Plaintiff is obligated to prove his reliance and must also prove that it is justifiable.

The requirement of causation as an element in a 10b–5 case does not conflict with this court's decision in *Mitchell v. Texas Gulf Sulphur*, 446 F.2d 90 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), *rehearing denied*, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972), a case on which the defendant-appellant here relies.[5] Plaintiff there had claimed reliance on a press release which had been issued on April 13, 1964. A corrective release was issued April 16, 1964. Some five days after the correction, plaintiff sold Texas Gulf shares relying on the April 13 release. In holding that plaintiff's recovery was barred, the court indeed did refer to failure to exercise due diligence. However, the gravamen of the decision was that in the circumstances plaintiff's reliance on a week-old release which had theretofore been corrected was unreasonable and was not a justifiable reliance. It was said:

> [a]t some point in time after the publication of a curative statement such as that of April 16, stockholders should no longer be able to claim reliance on the deceptive release, sell, and then sue for damages when the stock value continues to rise.

446 F.2d at 103.

*Mitchell* also held that the corporation's liability for the press release ought to have been limited because such a release makes a limited impact and after awhile, given the fact that the human memory is fallible, could not be a basis for justifiable reliance, so in effect the court was applying the justifiable reliance standard.

■ In the instant case the trial court found specifically that the Holdsworths relied on Strong's statements. *See* Findings of Fact 26, 33, and in Finding 29 the court

found that reliance was justifiable. The trial court's findings are as follows:

26. Plaintiff K. Jay Holdsworth discussed his conversation with defendant [Strong] and this letter with his wife plaintiff Dona S. Holdsworth, and in reliance upon the representations made by defendant and their effect upon the apparent value of their shares, were induced to and did sell their stock to defendant.

29. Although plaintiff K. Jay Holdsworth was a Director and Secretary of Sans-Copy at the time plaintiffs agreed to sell their stock to defendant and made no demand to examine the books and records of Sans-Copy before selling his stock, his failure to do so was excusable under the facts and circumstances of this particular case and in view of the relationship of the parties. They were best of friends. They were engaged in another business, a ranch, which was supervised by plaintiff K. Jay Holdsworth as to which plaintiff K. Jay Holdsworth kept defendant fully informed of material developments and they were associated in their church and in bar activities and in publications.

33. The evidence is clear and convincing that false representations were made concerning present existing material facts which representations were made for the purpose of inducing the plaintiffs to sell their stock and that the plaintiffs did sell their stock, acting reasonably under the circumstances and in ignorance of the falsity of said representations and that the plaintiffs in fact relied upon said representations and were thereby induced to sell their stock.

While it is true that Holdsworth was the business associate of Strong as well as a close friend and the shareholding was in a closely held corporation, it cannot be said that the reliance on Strong's honesty was not justified particularly considering that the relationship was of long standing and

---

**5.** Strong relies on two other Tenth Circuit cases as well. *Gilbert v. Nixon*, 429 F.2d 348 (10th Cir. 1970); *Financial Industrial Fund, Inc.* *v. McDonnell Douglas Corporation*, 474 F.2d 514 (10th Cir. 1973). None of the three cases on which he relies support his position.

particularly close so as to be one which was quasi-fiduciary. *See Bird v. Ferry,* 497 F.2d 112 (5th Cir. 1974).

We then conclude that the court's findings that the Holdsworths' reliance on Strong's misstatements was reasonable and justifiable and a causal link between Strong's conduct and the injury was supported. Even given the fact that Holdsworth was experienced or sophisticated, his reliance on Strong's honesty and integrity was justified when the extensive buildup to the transactions starting in the 1970s is considered. Strong was allowed to manage the corporation while Holdsworth was preoccupied with the ranch. Holdsworth was not placed on notice that his trust in Strong had been misplaced and so, throughout, the relationship between the parties had a fiduciary character.

Not only were Holdsworth and Strong business friends, their friendship extended as well to their families. This explains why Holdsworth failed to challenge Strong's representations every step of the way including the instance of the purchase by Strong of the stock. This trust and confidence had been carefully built up over a long period of time and had brought about the sale of the stock by means of long-range machinations. These factors furnished justification for the court to find that at the time of the sale of the stock Holdsworth was conditioned. In view, then, of the existence of justifiable reliance and considering the added fact that an examination of the corporation's books would not have revealed the falsity of Strong's representations, we conclude that in the particular factual climate justifiable reliance was a link sufficient to eliminate a need for the Holdsworths to show lack of contributory fault.

## IV.

### THE ARGUMENT THAT PROOF OF DAMAGES WAS ESSENTIAL

■ Strong's damage point is that plaintiff in a rescission case must prove damages with the degree of particularity which is demanded in an action for damages. We disagree. True, the plaintiff must establish his injury; obviously, the court is not engaging in the process merely to vindicate a principle. Plaintiff must show that he is injured and aggrieved in order to move the court to grant rescission. But the evidence does show that the Holdsworths did suffer property injury at the hands of Strong. They were induced to relinquish participation in an enterprise which would have yielded dividends had it not been for the diversion of funds. They were deprived of interest in a capital enterprise that had both growth potential and profit potential. Thus, the misrepresentations from the inception carried an impact.

In *Andrews v. Blue,* 489 F.2d 367 (10th Cir. 1973), we were required to consider the *measure* of damages in a rescission action; at the same time, we recognized that the ordinary consequence of rescission is return of the property. We added: "But the real estate had been sold to a bona fide purchaser; hence the next best solution was to give plaintiff the proceeds. Plaintiff was entitled to the fair value of his interest at the time of the unlawful merger." While this case recognized the need for a showing of injury in a rescission suit, it holds that damages are recoverable where the property is not available to be returned. This court's decision (opinion by Judge Hill) in *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969), recognized the victim's option to claim rescission or damages in a 10b–5 suit. In that case it held that out of pocket loss was the proper measure where the plaintiff chooses damages. It inferentially noted that no particular damage proof had to be followed in a rescission. The buyer there would relinquish the stock and his purchase money would be refunded.

## V.

### THE ISSUE OF MATERIALITY

In Finding of Fact 33 the trial court found that Strong's misstatements were material (Finding 33 is quoted *supra* ). In

effect it states that false representations were made concerning present facts which caused the Holdsworths to act and thus were material.

Strong argues that all of the alleged misrepresentations pertained to dividends and Strong's statement was that the company was not apt to pay dividends in the future. He says that inasmuch as the common stock never did pay dividends that this fact was incapable of causing the Holdsworths to sell their stock and hence were not material. However, the thrust of the fraud was to convince Holdsworth that neither the company nor its stock had worth; that it was too poor to pay dividends. This was false and this was material because it persuaded the Holdsworths to sell their common stock for a pittance. The trial court found that the misrepresentations as to the ability of the company to pay dividends was for the purpose of inducing plaintiffs to sell their stock and they did sell it for the low price, as we have already noted. Gross receipts of the company at that time were extremely high; falsity was thus proved.

The materiality of these misrepresentations concerning the corporation's ability to pay dividends cannot be challenged. The falsity of these representations is supported by the record and the trial court's findings of fact and conclusions of law are fully supported. We recognize that the materiality of the misrepresentations is essential to a 10b–5 recovery and to a common law fraud recovery as well. See Mitchell v. Texas Gulf Sulphur, supra. The position of the trial court that the representations were material in that a reasonable investor would have considered them in making a decision is not erroneous. See Affiliated Ute Citizens of Utah v. United States, supra, and see List v. Fashion Park, Inc., supra. Unquestionably a reasonable investor would be interested in the company's future prospects in deciding whether he should sell his stock. If it is not going to pay any dividends or is not capable of paying any dividends, this would be a material consideration. It is hard to understand how

the representation that a company has no earning power is to be regarded as non-material where it is given in order to induce the seller to sell.

## VI.

### COMMON LAW FRAUD

In challenging the recovery based on common law fraud, appellant argues that Holdsworth could not have justifiably relied on misrepresentations of Strong in support of a common law fraud case. This is another way of saying that the representations were not material or did not cause the injury. We hold, however, that this element and all of the elements of common law fraud as they are defined by the Supreme Court of Utah are satisfied. The trial court's findings and conclusions on this are correct and should be upheld. *Johnson v. Allen,* 108 Utah 148, 152, 158 P.2d 134, 137, enunciates the elements of common law fraud among which is reliance. It is there termed the right to rely. We are unable to see any difference between this and justifiable reliance. Noteworthy also is the fact that the court in *Johnson v. Allen, supra,* said that the law will seldom allow a plea of contributory negligence to a willful wrong. *See* 108 Utah 153, 158 P.2d 134.

The record in this case shows that Strong used deceitful means in order to gain full and complete control of the Sans-Copy Corporation, having used fraud and deception to induce the Holdsworths to sell their stock for an amount grossly less than its actual value. They are not to be heard to say that the Holdsworths ought not to have trusted Strong; that they had no right to rely upon what he said and did. The fact is that they did trust him and they did rely upon his statements and their reliance was justifiable in view of the closeness of their relationship.

Accordingly, the judgment of the district court should be and the same is hereby affirmed.

LEWIS, Chief Judge, did not participate.

SETH, Circuit Judge (concurring specially):

The litigation is between two of the three (or perhaps now two) stockholders of a local corporation. The parties are lawyers who started the business; they are directors of the corporation, and the plaintiff is also a C.P.A. and an officer of the corporation. The parties were close friends and associates. The sale was of a large part of the outstanding stock.

This is certainly not the situation or transaction contemplated by the courts which fashioned the remedy under Rule 10b–5, and it probably does not come within Rule 10b–5 anyway. It is no more than a common law fraud case. Thus I concur in division VI of Judge Doyle's opinion, and would affirm the trial court on that ground alone.

HILL, Circuit Judge, concurs in Judge SETH's specially concurring opinion.

BARRETT, Circuit Judge (specially concurring):

I believe that the thread is too thin to hold the facts of this case to the manipulative and deceptive devices proscribed by Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Commission, 17 CFR 240 10b–5. Reliance can only be had upon one letter submitted by Strong to Holdsworth wherein Strong represented that the corporation would never pay dividends in the future. That was an untrue statement. In addition, Strong omitted to state a number of material facts. Both because the thread is so thin and in light of the close relationship between the three stockholders, I agree with Judge Seth's view that this is not the type of security transaction contemplated for remedial purposes under Rule 10b–5.

I, too, concur in part VI of Judge Doyle's opinion, relying upon these specific findings of the trial court: (a) that the Holdsworth sale of his stock to Strong, although made without examination of the corporate books and records, was excusable in view of the close relationship—friendship between them, coupled with the fact that Strong did not keep accurate or complete books and records, and (b) that even had Holdsworth examined the books and records of the corporation kept by Strong, they would not have revealed the falsity of Strong's representations.

In concurring, I believe it is important to point out certain defaults on the part of Holdsworth. He was a practicing attorney, an accountant and a businessman who was no stranger to business transactions and legal entanglements. He knew "the ropes". Holdsworth was a director, officer and stockholder of Sans-Copy. Title 16–10–33, Utah Code Annot., Replacement Vol. 2B (1953) provides, *inter alia,* that the business and affairs of a corporation *shall* be managed by the board of directors. Title 76–13–8, Utah Code Annot., Vol. 8 (1953) provides that every director of a corporation is deemed to possess such a knowledge of the affairs of his corporation as to enable him to determine whether any act, proceeding or omission of its directors is a violation of Chapter 13 entitled "Corporation Frauds". The term "director" embraces any of the persons having by law the direction or management of the affairs of a corporation. Title 76–13–12, Utah Code Annot., Vol. 8 (1953).

Holdsworth did not perform the duties imposed upon him under the laws of Utah as a director and officer of the corporation. His default was, in large measure, an invitation for the fraud practiced upon him. Holdsworth's professional and business background was such that he was familiar with corporate affairs; he was familiar with financial reports, statements and accountings; and, almost certainly, he knew that the internal financial reports of a corporation could be and often are "doctored" so as to fail to disclose the true facts and that an independent audit would disclose the true state of affairs. It is only in reliance of the two specific trial court findings heretofore referred to that I am willing to accede that Strong's intentional fraud bars him from avoiding the liability imposed. A word of caution is in order.

While "negligence" and "fraud" are not legally equivalent terms, still the circumstances of each case must be carefully considered. In a proper case negligence may be so gross as to take the place of a deliberate intention to work a fraud.