**BRADFORD SECURITIES PROCESSING SERVICES, INC., Plaintiff,**

v.

**COUNTY FEDERAL SAVINGS AND LOAN ASSOCIATION, as successor to the First Federal Savings and Loan Association of Utica, New York, Defendant.**

Civ. A. 76 Civ. 1709 (KTD).

United States District Court,
S. D. New York.

Aug. 15, 1979.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff by Taylor R. Briggs, Eric H. Moss, New York City.

Gainsburg, Gottlieb, Levitan & Cole, New York City, for defendant by Richard J. Rubin, Nathan Silverman, New York City.

LUMBARD, Circuit Judge: *

Bradford Securities Processing Services, Inc., sues County Federal Savings and Loan Association under § 10(b) of the 1934 Securities Act, and Rule 10b–5 promulgated thereunder, for fraud in connection with a series of municipal bond transactions.[1]

Plaintiff is the successor to Securities Processing Services, Inc., (SPS), a securities clearing agency founded in 1970 to provide clearing services in municipal bond transactions for its broker/dealer customers. County Federal is successor in interest to First Federal Savings and Loan Association of Utica (First Federal), with whom all the dealings at issue took place. Since the witnesses and documents speak in terms of SPS and First Federal, as the parties were called at the time of the relevant transactions, the court uses these terms throughout.

In clearing a purchase of municipal bonds by one of its customers, SPS took delivery of the bonds and at the same time paid to the seller or his agent the purchase price agreed upon between the seller and its customer. Since SPS extended credit to its purchasing customers by paying for the bonds when received, it held the bonds as collateral for that advance until its customer requested delivery to a subsequent purchaser. SPS then collected payment upon delivering the bonds to the purchaser and credited the amount to its customer's account.[2]

First Federal was never a customer of SPS but did execute numerous municipal bond transactions through one Bruce C. Bressman, an SPS customer for whom SPS provided clearing services from around April 1, 1974 to September 13, 1974. SPS alleges that their course of trading was fraudulent and ultimately caused SPS the loss of some $2,700,000.

---

* Sitting by designation.

1. This action was initially assigned to Judge Duffy and subsequently reassigned for trial.

2. SPS profited from its clearing operations in two ways. It first collected fees from its customers on a per transaction basis. In addition, it charged interest to its customers on credit extended for the purchase of securities, the rate generally being ½ per cent above the rate charged by the banks from whom SPS itself borrowed money.

The allegedly fraudulent transactions between Bressman and First Federal involved a type of municipal bonds known as Industrial Revenue Bonds (IDR's). An IDR is issued by a municipality or its agency to attract industry to the municipality. The issuing authority employs bond proceeds to construct a plant site which it then leases to a private manufacturer. The rental payments made by the private firm are used to meet interest payments on the bonds and to retire portions of the principal debt. The IDR bondholder's only recourse for the payment of interest or repayment of principal is the revenue derived from the rental payments or, in the event of default, the properties of the underlying project. Because the soundness of any particular issue is dependent solely upon the success of the underlying project and the credit of the private manufacturer, IDR's generally are more speculative, and pay higher interest than general obligation municipal bonds. Under regulations of the Federal Home Loan Bank Board, IDR's are prohibited investments for a Federal Savings and Loan Association such as First Federal. 12 C.F.R. § 523.10[g][b].

First Federal, which in 1974 had approximately 8,000 depositors and assets of 65 million dollars, was located in Utica, New York. Its 10 million dollar securities investment fund was managed by Ernest J. McMurray, its Treasurer. McMurray, a high school graduate with a smattering of college credits, was originally employed by First Federal in 1960 and became successively head teller, Assistant Treasurer, and finally Treasurer in September of 1971. Initially, McMurray's practice was to obtain the approval from First Federal's president before executing any trades in the fund's securities. Later, however, such approval became a mere formality and McMurray exercised unrestricted authority to buy and sell securities on behalf of First Federal.

McMurray's first contact with Bressman occurred in the fall of 1972, when Bressman, then a municipal bond salesman with J. B. Hanauer & Company of Newark, New Jersey, made a routine telephone solicitation to First Federal. Soon thereafter McMurray began to buy and sell municipal bonds through Bressman on a substantial and regular basis. Their course of trading continued until September of 1974 when it became clear to SPS that a number of the bonds Bressman sold to and repurchased from McMurray, primarily the IDR bonds here in issue, were unmarketable.

Initially, McMurray's trading with Bressman was profitable for First Federal and was limited to such widely held securities as general obligation bonds of New York City, Philadelphia, California and Texas. In October of 1973, however, after Bressman had moved from J. B. Hanauer to Paragon, Inc. (later Municicorp, Inc.) in Los Angeles, McMurray for the first time purchased IDR's from Bressman which Bressman falsely assured him were permissible investments for First Federal. In the months that followed, the bulk of the McMurray-Bressman transactions were in IDR's, and particularly in four issues which are referred to as OSAGE, ARK VALLEY, MODA and KANAPOLIS bonds and which are the subject of this suit.

1) *OSAGE.* These bonds were Series A, 1973 bonds of the Osage Industrial Development Authority of Prue, Oklahoma, full issue par value of $3,000,000.

2) *ARK VALLEY.* These bonds were Series A, 1972 Water and Sewer Revenue Bonds of the Arkansas Valley Environmental and Utility Authority, Prue, Oklahoma, par value $1,510,000, and Series A, 1973 Special Assessment Revenue Bonds (Streets, Curbs and Gutters) of the same Arkansas Valley Authority, full issue par value of $840,000.

3) *MODA.* These bonds were issued by the Midwestern Oklahoma Industrial Development Authority (Chillcan Series), of Burns Flats, Oklahoma, full issue par value of $1,910,000.

4) *KANAPOLIS.* These bonds were Series A, 1972 Natural Gas Revenue Bonds of the City of Kanapolis, Kansas, full issue par value of $490,000.

SPS alleges that each of these bond issues was fraudulent from its inception and of

little, if any, intrinsic value. According to SPS, trading in the four IDR's was manipulated and controlled by two SPS customers, Bressman and Hugh J. Bell, who, fully aware of their fraudulent nature, were able through a scheme of round-robin trading to establish an artificial market for the bonds. First Federal was allegedly a knowing or reckless participant in this scheme through its substantial trading in the four IDR's with Bressman.

Bressman's source for the IDR's and the third leg of the alleged round-robin trading scheme was Hugh J. Bell. Bressman met Bell around June of 1973 when Bell was the principal municipal bond salesman for Stewart Securities, Inc. of St. Petersburg, Florida (Stewart). Bressman and Bell soon began to do substantial municipal bond trading, almost exclusively in IDR's. Stewart had at the time taken over nearly the entire OSAGE issue and in August of 1973 began jointly to underwrite the MODA IDR's as well.

Bell left Stewart to form Tower Brokerage, Inc. in St. Petersburg in December of 1973, taking with him Stewart's remaining unsold OSAGE and MODA bonds. Subsequently, Bell, through Tower, acquired the entire issues of both the ARK VALLEY and the KANAPOLIS bonds, the former in January and the latter in April of 1974. A substantial portion of Bell's trading in the OSAGE, MODA, ARK VALLEY and KANAPOLIS bonds was at all times with Bressman, but he also bought from and sold to as many as a dozen other dealers. At no time, however, did Bell trade in any securities directly with First Federal, and although he was apparently aware of Bressman's trading with First Federal, there is no evidence that McMurray ever knew of Bell or of the Bell-Bressman relationship.

Although the IDR's were, as noted above, unauthorized investments for institutions such as First Federal, McMurray accepted Bressman's representation that the IDR bonds were legal and made no further inquiry on his own. Despite the volume and frequency of First Federal's trading in IDR's, McMurray never made any investigation into the soundness or marketability of the bonds. Similarly, although Bressman sold the IDR's to First Federal at or near par and frequently repurchased them for the same or a slightly higher price, McMurray never negotiated with Bressman over prices or checked prices with any other broker/dealer. At least until September 1974, First Federal realized a satisfactory income from interests on the IDR bonds and from the small profits on purchases and sales.

Bressman and Bell opened accounts at SPS in the spring of 1974. Bell opened the Tower account in March with a cash deposit of $100,000. Approximately one month later, Bressman, with $55,000 borrowed from Bell, left Paragon, Inc. and opened his account at SPS under the name of National Municipals. Bressman and Bell each signed standard customer contracts with SPS authorizing SPS to deliver and receive securities on their behalf and to charge or credit their accounts for monies paid or received. Bell and Bressman were each required to maintain a 10% margin against all money advanced by SPS which, on the basis of their initial deposits, entitled them to credit lines of $1,000,000 and $550,000 respectively.

When Bressman and Bell executed purchases or sales between their respective accounts at SPS, no money changed hands and SPS simply debited or credited the appropriate account. Trades with other parties required SPS to deliver or take in securities, advance the purchase price or receive payment, and to adjust Bell's or Bressman's account accordingly.

In line with this standard clearing procedure, First Federal's own relationship to SPS was indirect. When Bressman executed a sale to First Federal, SPS would, upon tender of payment, deliver the bonds to First Federal's clearing agent, Bankers Trust Company in New York, and credit Bressman's account. The bonds themselves were never in the actual possession of First Federal but remained in New York City at Bankers Trust. Similarly, when Bressman purchased bonds from First Federal, SPS would take delivery of the bonds from First Federal's agent, pay to it the purchase

price, and debit Bressman's account. First Federal and SPS had no communication with each other.

Although clearance transactions in municipal bonds were usually completed within several days, or at most one week, many of the Bressman-McMurray transactions cleared by SPS took somewhat longer. Normally, more time would be required for completion if there was some delay in arrangements for payments. Where a purchaser had not been found the dealer might leave the bonds with SPS for a longer period and pay interest on the funds SPS advanced to cover the bonds' purchase price. Such a delayed transaction, where SPS kept possession of the bonds as security for eventual repayment of the monies advanced, was known in the industry as "warehousing." [3] McMurray testified that he was unaware of the nature of Bressman's account at SPS, including the fact that SPS extended credit for Bressman's purchases.

The first indications of trouble concerning the Bell and Bressman accounts at SPS came in late May of 1974, at a time when the general market for municipal bonds had entered a period of steep decline. An officer of SPS noticed that Bressman's account had come close to or was exceeding its margin limit and that his and Bell's accounts were doing an unusual amount of trading with each other. It was also noticed that Bressman's and Bell's accounts were heavily concentrated in IDR's, which SPS knew to be more speculative and less liquid than general obligation bonds.

As a result of inspection of their accounts, SPS arranged for Bressman and Bell to come to New York for a May 30 conference. Regarding the volume of trade between their individual accounts, Bell and Bressman explained that they worked closely together and that as a practical matter

the trading of one account could be considered the trading of the other. They offered to execute cross-guarantees that would effectively place the equity value of both accounts behind the trading of either one. SPS accepted Bressman's and Bell's offer of cross-guarantees, but it also insisted that the margin requirements for their accounts be revised. Bell and Bressman agreed to maintain a minimum cash balance of 40% of their inventory in IDR's with the additional limitations that neither account's gross inventory in IDR's could exceed $500,-000 and neither could hold more than $250,-000 in any one issue of IDR's.

All parties to the May 30 conference at SPS apparently assumed that Bressman and Bell would not be required immediately to meet SPS' new guidelines, but would be given an opportunity gradually to bring their accounts into compliance. SPS' records indicate, however, that from May 31 until their accounts were closed on September 14, 1974, neither Bell nor Bressman made any progress in reducing their inventory of IDR's, which increasingly were concentrated in the OSAGE, MODA, ARK VALLEY and KANAPOLIS bonds, or in otherwise complying with the May 30th agreement. In fact, Bressman's indebtedness to SPS, which was $215,441.90 as of May 31, increased to $698,290.88 by June 28, to $1,096,574.98 by July 31, to $1,307,986.02 on August 30, and stood at $1,396,526.46 when SPS closed his account on September 14th. Similarly, Bell's indebtedness was $758,534.39 on May 31, and grew to $2,677,-254.98 and $4,796,964.17 on June 28 and July 31 respectively, before settling at $3,063,834.07 when the account was closed in September.

Despite their growing indebtedness Bell and Bressman were permitted to continue trading in their accounts and utilizing SPS's

---

**3.** Warehousing of a bond inventory serves to provide interim financing for a broker/dealer or underwriter. The practice is apparently fairly common in the municipal bond industry, though opinions vary as to its propriety. Although SPS financed Bell's and Bressman's bond inventories by allowing their purchases to remain unpaid for a substantial period of time,

it has denied any knowledge that Bell and Bressman sought to use SPS as a warehouse. Similarly, McMurray has denied any knowledge that Bressman, who frequently sold bonds to First Federal only to repurchase them a few weeks later at the same or a slightly higher price, was using First Federal as a warehouse.

clearing services until September of 1974. The Securities and Exchange Commission had by that time begun an investigation into a number of the IDR's traded by Bell and Bressman, and although none of the bonds had as yet defaulted, the market for them, whatever it was, had collapsed. On September 13 SPS informed Bell and Bressman that it would liquidate the securities in their accounts unless within 24 hours they paid off their indebtedness. Neither Bell nor Bressman responded and SPS closed their accounts and began the process of liquidation.

SPS thereafter conducted an investigation into the OSAGE, MODA, ARK VALLEY and KANAPOLIS bonds and the projects which they had financed. In general it discovered that the bonds had been sold to the underwriters at a large discount and that the private ventures underlying the bonds were speculative and undercapitalized.

The OSAGE bond issue had been used to finance production for Multi-Products, Inc., a company whose sole product was the Beauty Fountain, a device to be attached to household shower-heads. By February, 1975, the date of SPS' investigation, the company had made no efforts to distribute its product and further production appeared to have ceased. The company's financial data indicated that Multi-Products was generating no revenues and had nearly exhausted its working capital. SPS ultimately located a party willing to purchase $2,105,000 face value of the bonds for $315,000, approximately 15 cents on the dollar.

The MODA bonds were used to finance plant facilities for Chillcan Corporation, which was organized to produce a self-cooling beverage container. Chillcan never began actual production and eventually became bankrupt. Prior to the company's default, SPS, which held in excess of $1,000,000 face value of the bonds, managed to sell a block of $225,000 for $41,625, and later received an additional $159,676 upon Chillcan's liquidation.

The ARK VALLEY bonds were issued to finance a water and sewer system as well as streets and curbing at a proposed residential development site. SPS investigators found no housing at the site, and the water and sewer system consisted of a single water tank with a salvage value of $5,000. SPS eventually disposed of $550,000 par value of the bonds for about $57,000.

The KANAPOLIS bonds were used to finance petroleum exploration and were the best of the IDR's left in Bressman's and Bell's accounts. SPS eventually sold $313,000 face value of the KANAPOLIS bonds for $227,500, a little better than 70 cents on the dollar.

In total, SPS recovered approximately $800,000 upon its liquidation of over $3,500,000 par value of OSAGE, MODA, ARK VALLEY and KANAPOLIS bonds pledged as security in Bressman's and Bell's accounts.[4]

## LIABILITY

SPS' claim of fraud under Rule 10b–5 charges First Federal with participation in a scheme of "round-robin" trading in the OSAGE, MODA, ARK VALLEY and KANAPOLIS IDR's and additionally with a series of misrepresentations and failures to disclose material facts in connection with its delivery of those bonds to SPS.[5] Rule 10b–5(1) prohibits use of "any device, scheme or artifice to defraud" in connection with the

---

4. As a result of its trading with Bressman, First Federal was itself left with a substantial quantity of unmarketable bonds, primarily IDR's of Mount Vernon, Alabama. First Federal's losses on these bonds are the subject of a separate action brought by First Federal in the Southern District of Alabama, *First Federal Savings and Loan Association, etc. v. Covington County Bank, et al.* (U.S.Dist.Ct., So.Dist.Ala., Dkt. No. 75–1978).

5. While this action remained before Judge Duffy, First Federal moved to dismiss contending that plaintiff lacked standing in that it was neither a purchaser nor seller of the securities in issue within the guidelines articulated by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Judge Duffy's opinion and order denying that motion is reported at 450 F.Supp. 208 (1978).

purchase or sale of securities. According to SPS, Bressman and Bell concocted a chain of "wash sales" and "match orders" in the four IDR bond issues with prices arbitrarily set for in excess of their value or cost, all with the intent to create an artificial market for the bonds. Through its trading with Bressman, First Federal allegedly aided or abetted this scheme or participated in it knowingly or recklessly.

Even though there is considerable evidence that Bressman and Bell created and manipulated an artificial market in their trading of the IDR bonds, SPS' attempt to fix liability on First Federal under 10b–5 must be rejected because it has failed to prove that First Federal acted with scienter, i. e., with knowledge or in reckless disregard of the alleged fraudulent scheme. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).[6]

■ McMurray's testimony regarding the transactions in question is before the court through the plaintiff's production of his extensive depositions given in this suit on March 3, 1977 and September 18, 1978, and his testimony given before the SEC and in other related litigation. His testimony is consistent and is not disputed by any of the voluminous exhibits carefully marshalled by the plaintiff or by any testimony which the court finds credible. The only testimony in conflict with McMurray's testimony is that of Bressman. Because of Bressman's conduct on the stand, his quarrelsome, quixotic and contemptuous attitude, the inconsistency between his testimony in court and his testimony given before the SEC and elsewhere, the court places no credit whatsoever on his testimony in this case, except to the extent that it is supported by documented evidence or the testimony of another witness.[7]

■ No evidence at trial established that First Federal, through McMurray, was aware or had reason to know that the four IDR's were fraudulent or worth significantly less than the prices at which they were traded with Bressman. Although McMurray's willingness to invest a large percentage of First Federal's portfolio based solely on the recommendations of Bressman appears suspect at first blush, the burden to establish that it was corrupt or in reckless disregard of fraud was on SPS as the plaintiff. The court finds that SPS has made no such showing.

First Federal, through McMurray, had dealt with Bressman since sometime in the fall of 1972. Bressman's handling of bond investments for First Federal had yielded a good income and gains had exceeded any losses. Until the SEC investigation in the fall of 1974, no loss had been threatened and none of the issues dealt in had been in default.

---

**6.** The proposition that liability for damages does not attach under Rule 10b–5 in the absence of scienter was of course established by the Supreme Court in the *Hochfelder* case. The Court, however, did not reach the issue of whether reckless, as opposed to knowing behavior, would support a cause of action.

As SPS has pointed out, the Court of Appeals for this Circuit has held that reckless conduct does meet the scienter requirement at least where a party owes a fiduciary duty to the party defrauded. *Rolf v. Blyth, Eastman, Dillon & Co., Inc.*, 2 Cir., 570 F.2d 38 (1978). Although there is no claim in this case of a fiduciary relationship between SPS and First Federal, the court need not resolve the issue of whether recklessness on First Federal's part would meet the scienter requirement since it finds no evidence that First Federal acted recklessly.

**7.** For example, the court discredits Bressman's testimony that he told McMurray that he would compensate him in return for First Federal's services as a warehouse. In addition, the court places no weight on Bressman's statement that he received from McMurray a letter giving Bressman full authority to execute trades on First Federal's behalf. Although a copy of the purported letter was produced in evidence, the court accepts McMurray's denial of its authenticity.

In discounting Bressman's testimony, the court intends no criticism of the plaintiff for calling Bressman, although this was possible only after the plaintiff had paid Bressman $3,000 in addition to a sixty dollar witness fee. Bressman was openly biased against the plaintiff as indeed he was against anyone who questioned his dealings or called him to account.

McMurray was remiss in making no independent inquiries and he was gullible in accepting Bressman's assurances regarding the propriety of First Federal investing in IDR bonds, their value and the market for them. In these respects, however, McMurray erred no more than have scores of money managers and investors of equal or greater sophistication who, accepting assurances of certain gain from those with whom their past dealings have been profitable, have, without further inquiry, made substantial investments.

SPS also argues that McMurray should have been alerted to the alleged underlying fraud by the pattern of trading in the IDR's. As an example of what it terms as "round-robin" trading, SPS cites the following series of transactions, each involving the same set of five MODA bonds, total par value $25,000:

| | | |
|---|---|---|
| 1/25/74 | Bell to Bressman at 98 (par is 100) | |
| 1/25/74 | Bressman to First Federal at 100 | |
| 2/11/74 | First Federal to Bressman at 100 ⅛ | |
| 2/11/74 | Bressman to Bell at 100 | |
| 3/14/74 | Bell to Bressman at 99 | |
| 3/14/74 | Bressman to First Federal at 100 | |
| 6/13/74 | First Federal to Bressman at 101 | |
| 6/13/74 | Bressman to Bell at 101 | |

Before, however, SPS can argue that McMurray's participation in this series of purchases and resales of the same bonds, all within a narrow range of prices, was in reckless disregard of fraud, it must establish that McMurray knew or should have known of Bressman's trades with Bell, and this it has plainly failed to do. First Federal's trades in the IDR's were exclusively through Bressman, and there was no evidence at trial that McMurray knew of any of the third parties with whom Bressman dealt. When the Bressman-Bell trades are removed from the series set out above, there remains only First Federal's purchase and resale of a block of bonds twice within a period of four months. Such trading perhaps should have suggested to McMurray that Bressman was churning First Federal's account for some interest of his own, but it gave him no reason to believe that he was trading fraudulent bonds in a rigged market.

SPS' allegations of material misrepresentations and omissions on First Federal's part fall under Rule 10b–5(2), which declares it unlawful to make "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . ." in connection with the purchase or sale of any security. With regard to First Federal's alleged misrepresentations, SPS contends that First Federal's delivery of bonds to SPS and simultaneous demand for payment was an implied representation that the price set between Bressman and First Federal was a market price and a reflection of the bonds' intrinsic value. These alleged representations are asserted to be false because the sale price of the bonds was not negotiated but unilaterally set by Bressman far in excess of the bonds' actual value.

The court finds questionable the claim that First Federal's simple delivery of bonds to a clearing agent for the ultimate purchaser can be taken as any type of representation, Cf. *American Bank & Trust Co. v. Barad Shaff Securities Corp.*, 335 F.Supp. 1276 (S.D.N.Y.1972), particularly since there is here no evidence that McMurray was aware that SPS had extended credit on the transaction or did anything other than perform the ministerial function of clearing. This issue need not be resolved, however, since the court finds that McMurray had no knowledge or reason to know that the alleged misrepresentations were untrue. As discussed above, SPS has failed to establish that McMurray was aware that the bonds were fraudulent or inflated in price. Nor has it been established that McMurray had any reason to know that the bond prices quoted to First Federal by Bressman were, as SPS has alleged, "off-market" and arbitrarily set by Bressman. Although the frequency and narrow price range of First Federal's and Bressman's trading in the four IDR's were somewhat unusual, there was sufficient variance in the intervals between First Federal's purchases and resales, as well as in the profit that it realized on

the resales, to justify McMurray in believing that the prices at which Bressman sold and repurchased were the result of normal market activity. Had McMurray known that Bressman commonly returned IDR's purchased from First Federal to Bell, the bonds' original source, he might have had reason to suspect the legitimacy of the market for the IDR's. Since McMurray, however, was not aware of the third parties with whom Bressman dealt, he had no reason to doubt that Bressman's repurchases from First Federal were related to his discovery of bona fide purchasers for the bonds.

■ SPS also argues that First Federal is liable for its failure to disclose a number of material facts concerning the IDR's it delivered to SPS. Although the court questions the existence of a disclosure obligation under 10b–5 upon one who merely delivers bonds to a clearing agent and makes no express statement or representation of any kind, the court finds in any event that First Federal cannot be charged with knowledge of the alleged material omissions. As discussed above, McMurray had no reason to know of the alleged facts that the trading among Bell, Bressman and First Federal was rigged, that the bonds were fraudulent and of little intrinsic value, and that the prices quoted by Bressman were arbitrary and off-market. No liability can attach for McMurray's failure to disclose matters of which he had no knowledge.

Although it is open to question whether even gross negligence on the part of SPS would be a defense for First Federal had there been clear evidence of First Federal's liability,[8] it should nevertheless be noted that it was SPS who at all times was in the best position to know what was happening and of the dangers involved in pledging its credit against the grossly overvalued IDR's.

SPS knew that IDR's were highly speculative and it had available to it the records that would have shown that Bell and Bressman were creating a market in the IDR's and using SPS as a warehouse for their investments. SPS, however, initially made no inquiry regarding the intrinsic value of the speculative IDR's and extended credit to Bell and Bressman far beyond the limits of the original agreements.

SPS commenced its inquiries only after the general bond market had fallen precipitously in the spring of 1974 and even then it continued to extend credit beyond the limits it considered prudent despite its knowledge that both Bell and Bressman were having increasing difficulty in disposing of the IDR's that they had warehoused with SPS. Thus, potential losses of approximately $1,000,000 as of May 31, 1974 were permitted to accumulate until they reached the total claimed of $2,700,000. In any event, since there is no evidence that First Federal knew or should have known of any of the fraudulent activities alleged by SPS, the court finds no reason for shifting to First Federal a loss caused largely by SPS' own negligence. This opinion constitutes the findings of fact and conclusions of law required by the Federal Rules of Civil Procedure.

SO ORDERED.

---

8. In light of the holding in *Hochfelder* that a private cause of action for damages under 10b–5 will not lie absent proof of scienter, some cases have suggested that plaintiff's lack of due diligence will not be a defense unless it amounts to reckless or intentional misconduct. *See Sundstrand v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977); *Holdsworth v. Strong*, 545 F.2d 687 (10th Cir.), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977).