868 F.2d 1151
 Fed. Sec. L. Rep. P 94,197
Ron GRUBB; Weatherford Interstate Holding Company,
Plaintiffs-Appellees-Cross-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION (successor-in-interest
to First National Bank and Trust Company of
Oklahoma City),
Defendant-Appellant-Cross-Appellee.
 Nos. 86-1687, 86-1728.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 16, 1989.
 
 Terry W. Tippens (Eric S. Eissenstat and Dino E. Viera with him, on the brief) of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., for plaintiffs-appellees-cross-appellants.
 Jay B. Williams (Kenneth I. Jones, Jr. with him, on the brief) of Jones, Blaney & Pringle, Oklahoma City, Okl., and Thomas S. Richey (G. Patrick Watson with him, on the brief) of Powell, Goldstein, Frazer & Murphy, Atlanta, Ga. (Michael Paul Kirschner, Teree E. Foster, and Shannon Self of Hastie and Kirschner, Oklahoma City, Okl.; and Alan R. Bromberg, Dallas, Tex., on the brief) for defendant-appellant-cross-appellee.
 Before McKAY and BRORBY, Circuit Judges and BRIGHT*, Senior Circuit Judge.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 Ronald J. Grubb recovered a judgment upon a jury trial in district court against First National Bank and Trust Company of Oklahoma City (First National) in the sum of $2,722,629.88 on a complaint alleging that First National committed fraud in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission, as well as Oklahoma state law, when it induced Grubb and a coinvestor to buy a second bank, Security State Bank of Weatherford, Oklahoma (Security State), by misrepresenting the financial condition of Security State. The judgment resting on the jury verdict also dismissed First National's counterclaims for recovery of amounts due it on promissory notes from Grubb and the Weatherford Interstate Holding Company (Weatherford Holding), a holding company in which Grubb held a fifty percent interest. After denial of First National's post-trial motions for judgment notwithstanding the verdict, for a new trial, or for remittitur, First National brought this appeal.[1] We affirm in part and reverse in part. Specifically, the judgment on liability and the dismissal of the counterclaims will stand, but we remand for a new trial on damages unless Grubb accepts a remittitur reducing the award to $222,629.88. The cross-appeal is dismissed. See infra note 2. We explain our reasons below.
 
 
 2
 The following issues are raised in this appeal: (1) whether the Supreme Court's decision in Langley v. FDIC, --- U.S. ----, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), entitles appellant Federal Deposit Insurance Corporation (FDIC) to summary disposition of its challenge to the verdicts for Grubb on the securities fraud claims and against First National on the counterclaims; (2) whether Grubb has standing as a "purchaser" of securities to bring a private action under federal and state securities laws; (3) whether Grubb acted recklessly so as to render erroneous the jury's award resting on findings that he justifiably relied on First National's alleged misrepresentations; and (4) whether the alleged misrepresentations proximately caused Grubb's consequential damages of $2.5 million based on two infusions of capital he made into Security State.[2]
 
 I. BACKGROUND
 A. District Court Proceedings
 
 3
 In their suit against First National, Grubb and Weatherford Holding alleged the following: (1) violations of federal and state securities laws; (2) common-law fraud; (3) breach of fiduciary duties; (4) breach of express warranties; (5) breach of contract; and (6) promissory estoppel. First National counter-claimed against Grubb and Weatherford Holding to recover principal and interest due on promissory notes and guaranties the plaintiffs executed in return for loans they used to purchase Security State stock. The district court consolidated the case with a similar action brought by William Schulte, Grubb's partner in this transaction, but Schulte settled his claims before trial.
 
 
 4
 At the close of evidence, on First National's motion for directed verdict of dismissal on all claims made against it, the district court directed a verdict for First National on all claims asserted by Grubb and Weatherford Holding except those alleging violations of statutory state and federal securities laws.
 
 
 5
 The jury awarded Weatherford Holding no damages, but awarded Grubb $2,722,629.88 on the federal and state securities fraud claims. Based on the proof the plaintiffs adduced at trial, these damages consisted of interest payments on the notes and capital Grubb contributed to Security State in September 1983 and March 1984. The jury also denied First National any recovery on its counterclaims against Grubb and Weatherford Holding on the notes. On October 31, 1985, the district court entered judgment on the jury verdicts.
 
 
 6
 After trial, First National filed a motion for judgment notwithstanding the verdict, or in the alternative for new trial or remittitur.[3] The district court denied these motions, and First National thereafter filed this timely appeal.[4]
 
 
 7
 After First National filed its notice of appeal, it encountered severe financial difficulties. The Comptroller of the Currency declared the bank insolvent on July 14, 1986, and appointed the FDIC receiver.
 
 B. FDIC's Status as Appellant
 
 8
 When the FDIC serves as receiver of a failed bank, it may pay off the bank's depositors by two methods. The first is simply to liquidate the bank's assets and pay the depositors their insured amounts, covering any shortfall with insurance funds. The FDIC tries to avoid this option, however, because it decreases public confidence in the banking system and may deprive depositors of the uninsured portions of their funds. FDIC v. Merchants Nat'l Bank, 725 F.2d 634, 637 (11th Cir.), cert. denied, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984).
 
 
 9
 The second, and preferred, alternative is to initiate a "purchase and assumption" transaction (P & A). In this type of transaction, the FDIC as receiver arranges to sell acceptable assets of the failed bank to an insured, financially sound bank, which assumes all of the corresponding deposit liabilities and reopens the failed bank without an interruption in operations or loss to depositors. The FDIC as receiver then sells to the FDIC in its corporate capacity the assets that the assuming bank declined to accept. The corporate entity of the FDIC in turn attempts to collect on the unacceptable assets to minimize the loss to the insurance fund. Id. at 637-38.
 
 
 10
 In this case, the FDIC reviewed First National's records and decided upon a P & A transaction. Through the resulting transaction, the FDIC in its corporate capacity allegedly acquired the notes and guaranties executed by Grubb and Weatherford Holding.
 
 
 11
 The FDIC as receiver thereafter became appellant on the portions of this appeal relating to Grubb's judgment against First National. In its corporate capacity, the FDIC became appellant on the part of the appeal challenging the denial of First National's counterclaims seeking to collect on the notes signed by Grubb and Weatherford Holding.[5]
 
 C. Facts
 
 12
 In 1982, Security State began experiencing loan and management problems that aroused the scrutiny of state and federal banking regulatory agencies. The Oklahoma State Banking Department and the Federal Reserve Board sent examiners to review Security State's credit files in January 1983. By early February, the preliminary findings of the examination classified $20 million of Security State's loans in three categories: substandard, doubtful, and loss. The examiners classified $5.2 million of the loans as loss. Charge-off of these loan losses would have absorbed Security State's existing capital reserves. These findings prompted state regulators to order the infusion of $5 million in capital by February 9, 1983, to prevent the liquidation of Security State.
 
 
 13
 On February 3, 1983, the state banking department notified First National, as pledgee of Security State stock, of the impending capital call and possible closing of Security State. Previously unaware of problems at Security State, First National sent a team of its own examiners to review Security State's credit files and verify the state's findings. The examination lasted two days, and the examiners left their review notes in the Security State files. In two internal First National memoranda dated February 8, 1983, the examiners confirmed the state board's classification of $5.2 million of the loans as total loss, but estimated that unidentified future losses could bring the total up to $15 million.
 
 
 14
 Schulte, the chairman of the board of Security State and owner of the largest block of shares of Weatherford Bancshares, Inc. (Bancshares), the holding company that then owned Security State, received notice of the state banking department's findings in early February. To prevent the failure of Security State, Schulte decided to find a partner to help him recapitalize and reorganize the bank. Officials at First National suggested to him Grubb, a First National customer who also owned several small banks in the area.
 
 
 15
 Schulte called Grubb on February 5 to see if he wanted to participate, and followed up by sending Grubb a computer printout listing names, amounts, interest rates, and due dates on 1,200 to 1,300 Security State loans. Grubb received the printout on Monday, February 7, and examined it for about an hour. Later that day, a First National officer called Grubb to give him the state's audit numbers, including the potential charge-off of $5.2 million, and to tell him of the impending capital call.
 
 
 16
 Initially, Grubb told First National officials that he only had an interest in acquiring Security State assets through a purchase and assumption transaction after the bank had closed. Nevertheless, First National's executive vice president, Robert Gilbert, with whom Grubb had dealt in several previous transactions, called Grubb on Tuesday, February 8, to suggest that Grubb come to Oklahoma City to discuss the possibility of First National foreclosing on the Security State stock and selling the stock to Grubb and Schulte. First National indicated that the capital call needed an affirmative response by late afternoon on February 9; otherwise, the bank would close and First National would lose $3.2 million.
 
 
 17
 During the afternoon of February 8, Grubb met with state regulators at Security State who informed him of the loss classifications of Security State's loans. Grubb also directed his attorney to prepare documents forming a holding company and restructuring the ownership of Security State. That evening, Grubb returned to Security State with his accountant and an officer from one of his banks to interview Security State's existing loan officers. They did not review loan files at that time, but did discuss the loans on the printout Grubb had received the day before.
 
 
 18
 In two phone calls on the morning of Wednesday, February 9, First National officials reminded Grubb of the deadline that day and asked him to travel to Oklahoma City to meet them. Grubb claims that he again informed First National of his preference for buying Security State assets through a P & A transaction, but agreed to go to Oklahoma City to apply for a loan from First National to finance the P & A acquisition and the recapitalization of the successor bank. Sometime that morning, First National's loan committee approved a loan to Grubb to finance the purchase of Security State.
 
 
 19
 Grubb traveled to Oklahoma City on the morning of February 9. On his way, he stopped at Security State in Weatherford and noticed that a run on deposits already was occurring. Grubb told at least one newspaper reporter at the scene that he planned to buy the bank. He claims that he made the statement in an effort to forestall the run so that assets would remain for him to purchase in a P & A transaction.
 
 
 20
 When Grubb arrived in Oklahoma City, vice president Gilbert and other First National officials informed him of First National's own examination of Security State files the previous weekend. Gilbert said the examining team felt the state board was extremely harsh on the credits, and that at least half of the $5.2 million in loans the board classified as loss potentially could be recovered. This statement directly conflicted with the internal memoranda drafted by the First National examining team, which indicated that loans with charge-off potential in fact could exceed $15 million.[6]
 
 
 21
 Based on First National's representations and accepted industry standards for projecting loan losses, Grubb calculated that only $2.6 million was actual loss and that about $2 million of the remaining $15 million classified as substandard and doubtful would be loss. Thus, in considering the proposed transaction, Grubb expected the losses to total $4.1 million to $5.2 million, rather than the $15 million that the First National officers projected in the internal reports of their examination. After First National offered Grubb a loan at two points below the national prime interest rate to finance the purchase of the Security State stock, Grubb agreed to the deal.
 
 
 22
 Later on February 9, Grubb and Schulte formed Weatherford Holding, and First National loaned each of them $625,000 to purchase half of the holding company's stock. Grubb executed a promissory note on his loan. Weatherford Holding then received a $3.75 million loan from First National to fund the purchase of Security State stock from First National, which earlier in the day had foreclosed on its security interest in the stock. As part of a complex transaction with several other components, Weatherford Holding injected the $5 million into Security State, and First National transferred all Security State stock to the holding company.
 
 
 23
 Weatherford Holding then executed a note pledging the Security State stock to First National as collateral for the $3.75 million loan. Grubb and Schulte also executed individual, unconditional guaranties on the Weatherford Holding note limited to $1.875 million each.
 
 
 24
 Grubb began operating and personally managing Security State on February 10, 1983. He testified that during the two months after he bought Security State, he worked at the bank from fourteen to eighteen hours a day, seven days a week. The bank continued to suffer problems, however, and by August 1983, Grubb had identified more than $14 million of anticipated losses--an amount much higher than that represented by First National during negotiations for the sale of the bank.
 
 
 25
 In August and September of 1983, Grubb asked First National to advance more money so that Security State could meet a $3 million capital call by the state banking department in September. When First National refused to fund the capital call, Grubb offered to return the Security State stock to First National in return for a release from his note and guaranty. First National declined this offer. As a result, Grubb caused Hydro Bancshares, an Oklahoma holding company he substantially owned, to make a capital contribution of $1.5 million to Security State. Grubb in turn executed a note to Hydro Bancshares for the amount of the contribution. Schulte contributed the other $1.5 million needed to meet the capital call.
 
 
 26
 On February 10, 1984, Grubb and Schulte each paid $222,629.88 in interest due on the three notes to First National as a condition precedent to renewal of the notes. In addition, Grubb and Schulte in March 1984 each contributed $1 million to Security State to meet an additional capital call. Shortly after Grubb and Schulte filed this suit on August 31, 1984, the state banking department issued another capital call. Grubb and Schulte failed to meet this capital call, and the state closed Security State on September 21, 1984. Thereafter, Grubb and Weatherford Holding defaulted on their notes to First National.
 
 II. DISCUSSION
 A. Summary Disposition Under Langley
 
 27
 On March 29, 1988, the FDIC filed a motion for summary disposition under Tenth Circuit Rule 27.1.1.[7] In its motion, the FDIC claims that a change in the law caused by the Supreme Court's decision in Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), entitles it to summary disposition of this appeal in its favor.
 
 
 28
 After considering the supplemental briefs submitted on this issue, we agree with the FDIC that, as indicated by our discussion below, Langley sufficiently clarified the law so as to alert the FDIC that it had a potential ground for summary disposition not previously asserted. In addition, contrary to Grubb's contention, the four-month delay between the Supreme Court decision and the filing of this motion is not excessive and does not bar us from addressing the merits of the motion. Nevertheless, we reject on the merits the motion for summary disposition.
 
 
 29
 In Langley, the makers of a note alleged that a bank had procured the note through oral misrepresentations. The Supreme Court held that the makers could not assert the defense of fraud in the inducement against the FDIC, which had purchased the note when the bank failed before trial of its suit to recover on the notes. 108 S.Ct. at 403. Specifically, the Court determined that the defense was barred by 12 U.S.C. Sec. 1823(e), which provides:
 
 
 30
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, * * * and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 
 
 31
 12 U.S.C. Sec. 1823(e) (1982). This provision, the statutory enactment of a common-law rule set forth in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 460, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942),[8] serves two main purposes. First, it permits federal and state banking examiners to rely on a bank's records in evaluating the fiscal soundness of the institution. Thus, the FDIC need not have concern about undisclosed conditions on notes when assessing the assets of a failed bank and making the often speedy decision whether to liquidate the bank's assets or to initiate a purchase and assumption transaction. Second, the strict requirements of section 1823(e) "ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Langley, 108 S.Ct. at 401.
 
 
 32
 In light of the above purposes, the Langley Court held that the term "agreement" in section 1823(e) includes express warranties and oral representations that constitute conditions on payment of the note. Id. at 402. Moreover, in Langley, the FDIC's knowledge of the pending lawsuit and the maker's defenses when it acquired the bank's interest in the note did not make section 1823(e) inapplicable. Id. The rule also applies to guarantors of notes who try to raise defenses against the FDIC. FDIC v. Galloway, 856 F.2d 112, 115 (10th Cir.1988).
 
 
 33
 The FDIC now argues that Langley controls this case so that section 1823(e) and D'Oench justify summary disposition in its favor on both Grubb's fraud claims and First National's counterclaims. We disagree. Langley does not apply because of significant procedural and factual differences between it and the present case.
 
 
 34
 In this case, the district court had entered a judgment denying First National recovery on the Weatherford Holding and Grubb notes before the FDIC purchased the bank's assets in a P & A transaction. Unlike the notes in Langley, which were merely voidable when the FDIC acquired them, these notes already had been voided by the judgment when the FDIC purchased First National's assets. Therefore, the FDIC acquired no "right, title or interest" in the Grubb and Weatherford Holding notes that the fraud claims and defenses could "diminish or defeat," and section 1823(e) does not bar those claims and defenses. See Langley, 108 S.Ct. at 402-03 (defense that renders instrument entirely void, as opposed to merely voidable, takes instrument out of protection of section 1823(e)); FDIC v. Merchants Nat'l Bank, 725 F.2d 634, 639 (11th Cir.), cert. denied, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984) (section 1823(e) does not apply when "the parties contend that no asset exists or an asset is invalid and that such invalidity is caused by acts independent of any understanding or side agreement"); FDIC v. Prann, 694 F.Supp. 1027, 1037 (D.P.R.1988) (section 1823(e) inapplicable when debt that formed basis of asset claimed by FDIC was satisfied before FDIC acquired failed bank's assets); FDIC v. Nemecek, 641 F.Supp. 740, 742-43 (D.Kan.1986) (settlement of bank's suit against obligor cancelled note before FDIC acquired it, making section 1823(e) inapplicable).
 
 
 35
 Additionally, because a judgment already existed when the FDIC purchased First National's assets, the purposes of section 1823(e) are not vitiated. The judgment provided the FDIC a reliable record indicating that the notes were void, and collusion between Grubb and First National seems highly unlikely because the parties had fully and heatedly litigated the securities fraud issue to judgment before the bank failed. Thus, Langley and section 1823(e) do not apply to this case.
 
 
 36
 Even if section 1823(e) did apply in this case, it only would protect the FDIC in its corporate capacity as purchaser of First National's assets and in its assertion of its counterclaims on the notes signed or guarantied by Grubb. See FSLIC v. Murray, 853 F.2d 1251, 1254 (5th Cir.1988); FDIC v. Vogel, 437 F.Supp. 660, 664 (E.D.Wis.1977). The Langley rationale precludes the application of the common-law D'Oench doctrine when the FDIC acts in its corporate capacity. Taylor Trust v. Security Trust Fed. Sav. & Loan Ass'n, 844 F.2d 337, 342 (6th Cir.1988) (real defense to formation of contract that renders contract void from its inception takes agreement out of D'Oench doctrine).
 
 
 37
 To the extent that the D'Oench rule may provide residual protection to the FDIC as receiver, see FDIC v. McClanahan, 795 F.2d 512, 514 & n. 1 (5th Cir.1986); FDIC v. Van Laanen, 769 F.2d 666, 667 (10th Cir.1985), that protection is unavailable against Grubb's affirmative claims of fraud. First, Grubb asserted the fraud claims and obtained a judgment against First National, not the FDIC. By its very terms, however, the D'Oench rule only prevents parties from raising defenses against the FDIC. Moreover, because of the judgment, First National no longer held valid notes when the FDIC took over as receiver. The FDIC cannot claim the protection of D'Oench when a judgment already has voided the asset. Finally, the judgment prevented the FDIC from being misled. See D'Oench, 315 U.S. at 460, 62 S.Ct. at 680 (one purpose of rule is to prevent FDIC from being misled).
 
 
 38
 For the above reasons, neither section 1823(e) nor D'Oench entitles the FDIC to summary disposition in its favor. Thus, we turn to the remaining issues on appeal.
 
 B. Standing Under Rule 10b-5
 
 39
 The FDIC argues that Grubb lacks standing to bring a private action under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission.[9] A party bringing a private action for money damages under Rule 10b-5 must be an actual purchaser or seller of securities. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-33, 95 S.Ct. 1917, 1923-24, 44 L.Ed.2d 539 (1975). This judicially created standing requirement is commonly called the Birnbaum rule. Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463-64 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The FDIC contends that because Weatherford Holding, rather than Grubb, actually purchased the Security State stock from First National,[10] the Birnbaum rule precludes Grubb from bringing a direct Rule 10b-5 action based on fraud that allegedly procured the sale.[11]
 
 
 40
 1. Whether the FDIC Can Now Raise the Standing Issue
 
 
 41
 As a threshold matter, Grubb asserts that the FDIC cannot raise the standing issue on appeal from the denial of the motion for judgment n.o.v. because First National did not raise the issue in its motion for a directed verdict as required by Rule 50(b) of the Federal Rules of Civil Procedure. Firestone Tire & Rubber Co. v. Pearson, 769 F.2d 1471, 1478 (10th Cir.1985); Johnson v. Rogers, 621 F.2d 300, 305 (8th Cir.1980).[12] We disagree.
 
 
 42
 First National raised the issue of Grubb's standing to bring this Rule 10b-5 action in a motion for summary judgment that the district court denied on October 15, 1985. The denial of this motion was interlocutory and nonappealable. 6 J. Moore & J. Wicker, Moore's Federal Practice p 56.27, at 56-847 (2d ed. 1988). This appeal from the judgment, see supra note 4, permits First National, and now the FDIC, to challenge all prior nonfinal orders, including the order denying summary judgment which rejected the standing argument. 9 J. Moore, B. Ward & J. Lucas, supra, p 203.18, at 3-80. Having attacked the standing issue in a preliminary motion, First National does not waive that issue by its later defense to the underlying merits, for that defense would not have taken place had the movant's position prevailed. Scola v. Boat Frances R., Inc., 546 F.2d 459, 460 (1st Cir.1976).[13]
 
 
 43
 In this case, the question of standing under Rule 10b-5 rests on undisputed facts and thus presents a legal question addressed to the court rather than the jury, and a judgment n.o.v. on that ground would not invade the province of the jury or prejudice Grubb. See Benson v. Allphin, 786 F.2d 268, 274 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) (applying same rationale to j.n.o.v. motion based on qualified immunity defense not raised in directed verdict motion at close of all evidence). Thus, Rule 50(b) does not prevent the FDIC from raising the purely legal issue of standing on appeal. See Creative Cookware, Inc. v. Northland Aluminum Prods., 678 F.2d 746, 748 (8th Cir.1982) (appellate court may review legal questions not raised in motion for directed verdict). We therefore reach the merits on the standing issue raised by the FDIC.
 
 
 44
 2. Application of the Birnbaum Purchaser-Seller Rule
 
 
 45
 The Supreme Court adopted the Birnbaum purchaser or seller requirement in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-33, 95 S.Ct. 1917, 1923-24, 44 L.Ed.2d 539 (1975). Specifically, the Blue Chip Court held that Rule 10b-5 did not confer standing upon plaintiffs who claimed that an overly pessimistic prospectus dissuaded them from buying stock. Because the plaintiffs had never purchased securities in the transaction giving rise to the alleged fraud, the Supreme Court held that the Birnbaum rule precluded them from maintaining the Rule 10b-5 action. 421 U.S. at 755, 95 S.Ct. at 1934.
 
 
 46
 The Blue Chip Court ruled that application of the requirements of Birnbaum serves to bar three classes of potential plaintiffs from bringing actions under Rule 10b-5, including, most pertinent to this case, the class of "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5." 421 U.S. at 737-38, 95 S.Ct. at 1926. The Court noted that members of this class may seek redress by filing a derivative action on behalf of the corporate issuer.
 
 
 47
 Several policy concerns prompted the Court to adopt the purchaser or seller requirement to limit the class of potential plaintiffs. Specifically, the Court feared that mere bystanders to a transaction could "await developments on the sidelines without risk" and, if unhappy with the results, initiate "strike" or nuisance suits that almost always would be sufficient to reach a jury because they would turn on the conjectural determination of "hazy issues of historical fact," such as whether a particular plaintiff would have purchased or sold but for the alleged misrepresentation or failure to disclose. Id. at 746-47, 95 S.Ct. at 1930-31. By limiting the class of plaintiffs to actual purchasers and sellers, the Birnbaum rule avoids vexatious litigation by ensuring that the conduct of the parties and the resulting damages are objectively demonstrable. Id. at 747, 95 S.Ct. at 1931.
 
 
 48
 The policy concerns that prompted the Blue Chip Court to adopt the Birnbaum rule do not apply in this case. Grubb was not a mere bystander to the sale of Security State stock. First National made the alleged representations directly to Grubb before Weatherford Holding even existed, thus inducing him to involve himself in the transaction by borrowing $625,000 to establish the holding company and personally guarantying repayment of one-half of its loan to purchase the Security State stock. As a result of the note and the unconditional guaranty, Grubb was the actual party at risk in the transaction. In effect, Grubb himself bought half of the Security State stock. See Norris v. Wirtz, 719 F.2d 256, 259-60 (7th Cir.1983), cert. denied, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984) (beneficiary of trust that sold securities had standing under Rule 10b-5 because representations made directly to beneficiary, who had right to approve sale and experienced direct impact of transaction); Banco Nacional De Costa Rica v. Bremar Holdings Corp., 492 F.Supp. 364, 371-72 (S.D.N.Y.1980) (unconditional guarantor of note had standing because it stood in shoes of maker which dealt in security); see also Mullen v. Sweetwater Dev. Corp., 619 F.Supp. 809, 815-16 (D.Colo.1985) (Birnbaum did not apply to stockholder who had contractual right of first refusal over stock sold by corporation); Hackford v. First Sec. Bank, 521 F.Supp. 541, 549 (D.Utah 1981) (Blue Chip concerns did not arise when beneficiaries sued trustee in connection with sale of trust assets in which they had beneficial interest); Heyman v. Heyman, 356 F.Supp. 958, 964-66 (S.D.N.Y.1973) (beneficiary of testamentary trust had standing to sue purchaser of estate asset who was contractually bound to pay fair price).
 
 
 49
 In this respect, the instant case can be distinguished from City Nat'l Bank v. Vanderboom, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970), which the FDIC cites for the proposition that shareholders who contributed money directly to a closely held corporation for the purchase of stock of another entity do not have standing to bring a Rule 10b-5 action. In rejecting the shareholders' "conduit" theory under the doctrine of "piercing the corporate veil," the Eighth Circuit pointed out that the claimants did not comprise all of the shareholders of the defrauded company. Moreover, the company existed before its directors even looked into the possibility of buying the stock in question. Id. at 228. In this case, Grubb and Schulte formed the holding company as sole shareholders, after First National made the alleged representations, for the sole purpose of buying the Security State stock.[14]
 
 
 50
 The present case also does not fall within the factual pattern addressed in Blue Chip in that the relevant transactions are well documented in written notes, stock certificates, and cancelled checks. Thus, Grubb's damages may be objectively calculated. The court need not rely solely on uncorroborated oral testimony to resolve hazy issues of historical fact.
 
 
 51
 Finally, Blue Chip concerns do not arise in that Grubb seeks damages not for a decrease in the value of his Weatherford Holding stock, but for the direct injury he suffered as a result of the note and guaranty he executed in reliance on First National's representations. Individual stockholders may bring nonderivative actions when seeking redress for direct injury, as opposed to harm to the corporation's shareholders generally. See Grogan v. Garner, 806 F.2d 829, 834-36 (8th Cir.1986).
 
 
 52
 Courts should read Rule 10b-5 flexibly, not technically. See Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971); Windon Third Oil & Gas Drilling Partnership v. FDIC, 805 F.2d 342, 346 (10th Cir.1986), cert. denied, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The remedial purpose of the rule should not be defeated by taking a technical, unrealistic view of what happened in a case. Norris, 719 F.2d at 261; Heyman, 356 F.Supp. at 966; see also Less v. Lurie, 789 F.2d 624, 626 (8th Cir.1986) (dictum) (having critical transaction in own name not required for standing under Blue Chip ). Looking at this transaction realistically, we believe the above factors indicate that Grubb was the actual purchaser of the Security State stock within the rationale of Blue Chip. Thus, the Birnbaum rule does not deprive him of standing under Rule 10b-5.
 
 C. Reliance and Causation
 
 53
 In a misrepresentation case under Rule 10b-5, a plaintiff generally must establish that, in connection with the purchase or sale of a security, "the defendant, with scienter, made a false representation of a material fact upon which the plaintiff justifiably relied to his or her detriment." Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1516 (10th Cir.1983) (citing Holdsworth v. Strong, 545 F.2d 687, 694 (10th Cir.1976) (en banc), cert. denied, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977)). The "justifiable reliance" requirement ensures that a causal connection exists between the misrepresentation and the plaintiff's injury. Id. Reckless conduct by the plaintiff that rises to a level of culpability comparable to the defendant's breaks this chain of causation and renders the plaintiff's reliance unjustifiable. Id.; see Holdsworth, 545 F.2d at 693. In this vein, a plaintiff may not justifiably rely on a misrepresentation when its falsity is palpable. Holdsworth, 545 F.2d at 694. Additionally, a plaintiff may not close his or her eyes and refuse to investigate in disregard of a known risk or a risk so obvious that the plaintiff must be taken to have been aware of it. Zobrist, 708 F.2d at 1517.
 
 
 54
 Based on the above legal framework, the FDIC argues that (1) Grubb is not entitled to a presumption of reliance; (2) Grubb's recklessness in purchasing Security State stock rendered his reliance unjustifiable; and (3) Grubb did not establish a right to consequential damages for later infusions of capital into Security State because he failed to prove that the misrepresentations proximately caused the later capital contributions.
 
 1. Application of a Presumption of Reliance
 
 55
 Although a plaintiff in a Rule 10b-5 action bears the burden of proving reliance on a misrepresentation, a different burden of proof applies when a case primarily rests on a failure to disclose. In such a case, reliance on the omission is presumed when the plaintiff establishes that the defendant withheld material information and that the defendant owed the plaintiff a duty to disclose. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). This presumption recognizes the unique difficulty of proving reliance on a failure to disclose material information of which the plaintiff did not know. Holdsworth, 545 F.2d at 695.
 
 
 56
 In this case, the trial court submitted an instruction on proof of reliance that outlined differing burdens for cases involving misrepresentations and omissions. The instruction on omissions provided in part:
 
 
 57
 Accordingly, if you find from a preponderance of the evidence that there were material facts intentionally not disclosed to the plaintiffs in connection with the transactions in question, then the defendant and not the plaintiffs have the burden to demonstrate that even if the material facts had been disclosed, the plaintiffs' investment decision would not have been different.
 
 
 58
 The FDIC now argues that this type of instruction, permitting the jury to set the burden of proof, is inappropriate when singular conduct can be characterized as either misrepresentation or omission. See Abell v. Potomac Ins. Co., 858 F.2d 1104, 1119 (5th Cir.1988) (Ute presumption applies only when defendant allegedly failed to disclose any information rather than revealed only part of truth in effort to mislead).[15] In mixed cases of this sort, the FDIC contends that the trial court, rather than the jury, should characterize the case as being primarily a misrepresentation case or an omission case. See Cavalier Carpets, Inc. v. Caylor, 746 F.2d 749, 756 (11th Cir.1984).[16] The instructions then would reflect the proper burden of proof.
 
 
 59
 First National did not, however, specifically object to this aspect of the instruction on reliance before the trial court submitted it to the jury. Thus, we review the instruction under the plain error doctrine. As indicated by our discussion in the next section, First National suffered no prejudice by reason of the instruction in question. Thus, no plain error occurred.2. Justifiable Reliance
 
 
 60
 The Zobrist court listed the following factors to assess in determining whether a plaintiff has satisfied the burden of proving that he or she justifiably relied on a defendant's misrepresentations:
 
 
 61
 (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.
 
 
 62
 708 F.2d at 1516. Courts and juries must assess all relevant factors; no single factor is determinative. Id. at 1516-17.
 
 
 63
 A close analysis of the Zobrist factors in this case reveals that the jury could determine that Grubb justifiably relied on First National's misrepresentations when he and Schulte decided to purchase Security State. The February 9 deadline imposed by the state banking department left Grubb only about three days to decide whether to participate in the proposed transaction. During this period, First National had access to all relevant information, while Grubb had access only to the computer printout provided by Schulte, the representations of First National, and the loan classifications of the state banking department.
 
 
 64
 Grubb did not have access to the results of First National's own examination of Security State.[17] Although Grubb had dealt with First National in prior loan transactions, First National owed Grubb no fiduciary duty to disclose that it conducted its own examination of Security State's loan portfolio. Nevertheless, ample evidence shows that First National volunteered information about that examination and affirmatively misrepresented its results. Because Grubb had limited time and access to very little information, the jury could find that he had no opportunity to detect this fraud. The jury also could conclude that First National gave the false information to induce Grubb to buy Security State.
 
 
 65
 Other Zobrist factors also support the jury's determination of reliance. For example, First National initiated this transaction and prodded it along with numerous phone calls. Although Grubb initially expressed his desire to acquire Security State assets through a purchase and assumption transaction, First National eventually persuaded Grubb to purchase the bank directly by offering financing at two points below the national prime interest rate. Additionally, the loss projections that First National represented to Grubb were reasonably specific--they indicated that half of the $5.2 million in loans classified as loss by state regulators actually would be recoverable.
 
 
 66
 The only Zobrist factor that plays in the FDIC's favor is Grubb's apparent sophistication and expertise in banking. Numerous countervailing factors could outweigh Grubb's expertise, however, and the jury could conclude that Grubb justifiably relied on First National's misrepresentations in deciding to participate in this transaction and assume the corresponding financial obligations.[18] Overall, considering the weight and nature of the evidence, we believe that a reasonable jury could conclude that Grubb affirmatively established reliance and would not need to apply the Ute presumption.
 
 3. Causation of Consequential Damages
 
 67
 The jury's award of consequential damages apparently rests on Grubb's proof of the $2.5 million he contributed to Security State in September 1983 and March 1984 to meet capital calls by the state banking department, plus $222,629.88 for the interest payments he made to First National in February 1984 as a condition to renewal of the Grubb and Weatherford Holding notes.[19] The FDIC argues on appeal that, as a matter of law, Grubb failed to prove that First National's misrepresentations proximately caused him to make these expenditures in light of the bank's obvious impending failure.[20]
 
 
 68
 Rule 10b-5 allows recovery of consequential damages when the plaintiff proves with reasonable certainty that the fraud caused the damages. James v. Meinke, 778 F.2d 200, 205 (5th Cir.1985); deHaas v. Empire Petroleum Co., 435 F.2d 1223, 1228-29 (10th Cir.1970). Under this causation standard, plaintiffs cannot recover for losses caused by their own failure, since they became aware of the fraud, to take reasonable steps to preserve their assets and avoid further harm. Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 620 (9th Cir.1981); see also L. Loss, Fundamentals of Securities Regulation 1135 (1983) (duty to mitigate arises at point when reasonable person would have taken action).
 
 
 69
 a. Subsequent Capital Contributions
 
 
 70
 Courts allow recovery of consequential damages for capital contributions such as Grubb's when the plaintiff proves that: (1) "each expenditure * * * was a reasonable effort to, e.g., minimize plaintiffs' losses;" (2) the expenditures were an effort to save the company from a "pre-existing insolvency concealed by defendants;" and (3) but for the defendant's misrepresentations, the plaintiff would not have made those expenditures. Madigan, Inc. v. Goodman, 498 F.2d 233, 238-39 (7th Cir.1974) (emphasis added). Under this standard, substantial evidence does not support that part of the jury award representing the capital infusions Grubb made in the sum of $2.5 million.
 
 
 71
 The undisputed evidence shows that the first few months after the transaction were an eye-opening experience for Grubb. During this period, Grubb worked at Security State fourteen to eighteen hours a day, seven days a week, reviewing loan files and interviewing borrowers. Thus, by the summer of 1983, Grubb had had ample opportunity to discover the bank's true condition.
 
 
 72
 The evidence also establishes that Grubb knew of the bank's dire condition when a further examination by the state banking department in July 1983 resulted in the imposition of another $5 million capital call. After Grubb convinced the regulators to allow the bank to meet the call by contributing $3 million in September 1983 and $2 million in March 1984, he asked First National to fund the first infusion. When First National refused, Grubb proposed that the parties rescind the whole deal, returning the Security State stock to First National in exchange for a release of Grubb's obligations under the notes and guaranty, so that the bank could close under First National's ownership. First National also declined this offer.
 
 
 73
 On August 26, 1983, Grubb wrote to Roy Jackson, the regional director of the FDIC in Dallas, requesting open bank assistance from the FDIC. In this letter, Grubb himself estimated Security State's anticipated loss at $14,156,986.07. Grubb confirmed this estimate in his testimony at trial:
 
 
 74
 Q Okay. Now, Mr. Grubb, at the time you wrote this letter in August of 1983, what did you tell Mr. Jackson your losses were? I believe you earlier said you told him they were over 14 million dollars.
 
 
 75
 * * *
 
 
 76
 * * *
 
 
 77
 A Reading from the report, since that date, the date being February 9, 1983, we determined that the bank has incurred or will incur losses and collection expenses in excess of 14 million dollars.
 
 
 78
 Q And you knew that long before you wrote this letter in August of '83, didn't you?
 
 
 79
 A Knew what, sir?
 
 
 80
 Q That your losses were going to be high.
 
 
 81
 A Yes, sir. Knew it the day I wrote the letter. Yes, sir.
 
 
 82
 Tr., Vol. II, at 100-01. The FDIC eventually rejected the proposal for open bank assistance.[21]
 
 
 83
 Despite his knowledge that Security State faced more than $14 million in future losses, Grubb met the capital call on September 30 by causing Hydro Bancshares, a holding company he substantially owned, to contribute $1.5 million to Security State in exchange for a promissory note from Grubb. Schulte contributed the remainder needed to meet the capital call. During trial, Grubb testified about his knowledge and his reasoning at the time he made the infusions:
 
 
 84
 Q Okay. What was the--was your opinion in--at the time you made this capital contribution that the loan losses were in Security State Bank at that time?
 
 
 85
 * * *
 
 
 86
 * * *
 
 
 87
 A What was my opinion of the condition of the loans at the time we made the injection?
 
 
 88
 Q Yes, there in September, 1983.
 
 
 89
 A It wasn't good. We knew that we had even more losses yet to come.
 
 
 90
 Q Okay. Well, why did you put the capital into the bank right then if you knew there was [sic] more losses to come?
 
 
 91
 * * *
 
 
 92
 * * *
 
 
 93
 A I couldn't let the bank go down. I couldn't let it close.
 
 
 94
 Q Why is that, Mr. Grubb?
 
 
 95
 A Because my business was in the banking industry. At that time, I had eight or nine banks, and I felt like if I let that bank close that it would start a panic and run on the rest of my banks.
 
 
 96
 Tr., Vol. I, at 137-38. After Grubb and Schulte made the first infusion, First National again refused to rescind the transaction or provide further funding. As a result, Grubb sold some of his other properties and business interests to meet his half of the $2 million capital call in March 1984.
 
 
 97
 Because this evidence stands undisputed, Grubb has failed to prove causation between First National's initial misrepresentations and his ultimate decision to make the later capital contributions of $2.5 million. By the time Grubb made the first infusion in September 1983, he knew the extent of the bank's potential losses. At this point, he no longer could rely on First National's misrepresentations, nor on a reasonable business judgment on his part. His claim that the closing of Security State would jeopardize his other banks is a conclusory statement resting wholly on speculation.
 
 
 98
 Furthermore, the evidence establishes that Grubb's decision to inject further capital could not minimize his losses. Absent collecting from First National, Grubb in fact acted in a manner to increase his losses.
 
 
 99
 In light of the impending losses of at least $14 million, the injections of $3 million in September 1983 and $2 million in March 1984 obviously were far too little, too late to save the bank. Madigan establishes that reasonable capital infusions to save a failing company may be recoverable. 498 F.2d at 239. But here the infusion of $5 million by Grubb and Schulte to a bank then showing potential losses of $14 million cannot qualify as a reasonable business decision, nor a reasonable effort to save the bank under Madigan.
 
 
 100
 Grubb himself essentially acknowledged the unreasonableness of infusions like these when he testified, in another context, why he would not have purchased the Security State stock had he known the actual loss estimates of First National's examining team: "Why would I buy a bank that was already broke? Why would I put five million [dollars] into a bank that was expecting another ten or 15 million dollar loan losses [sic]?" Tr., Vol. I, at 172. Yet, this is exactly what he and Schulte did in making the later capital infusions.
 
 
 101
 In sum, substantial evidence does not support the jury's verdict to the extent that award includes the sum of $2.5 million claimed by Grubb as consequential damages. The trial court should have granted a new trial on the damages issue or, in the alternative, permitted Grubb to accept a remittitur to exclude the $2.5 million representing the capital infusions. See O'Gilvie v. International Playtex, Inc., 821 F.2d 1438, 1448 (10th Cir.1987).
 
 
 102
 b. February 1984 Interest Payments
 
 
 103
 Ample evidence, on the other hand, supports the award for Grubb based on interest payments he made to First National in February 1984. Unlike with the capital contributions in September 1983 and March 1984, Grubb did not rely solely on his independent business judgment in making the interest payments. Rather, he owed a preexisting legal obligation under the promissory notes to pay that interest. Thus, the damage award representing Grubb's February 1984 interest payments of $222,629.88 can be sustained on the evidence. Because the jury returned a general verdict, however, we must direct the district court to order a new trial on damages unless Grubb accepts a remittitur reducing the verdict to $222,629.88.
 
 III. CONCLUSION
 
 104
 We affirm the district court's determination granting Grubb standing to bring this action under section 10(b) and Rule 10b-5. In addition, we affirm the district court's judgment dismissing the counterclaims, thus releasing Grubb from his obligations under his personal note for $625,000 and his personal guaranty on $1.875 million of the Weatherford Holding note. As we have observed, the evidence supports the damage award only to the extent of the $222,629.88 representing Grubb's interest payments on the notes. The $2.5 million in damages the jury awarded for capital infusions cannot stand, based on the record before us.
 
 
 105
 Accordingly, we affirm in part and reverse in part. We remand this case to the district court to grant the FDIC a new trial on the damages issue only, unless Grubb consents to a remittitur reducing the award to $222,629.88 plus appropriate pre- and postjudgment interest. We award no costs on appeal.
 
 
 
 *
 The Honorable Myron H. Bright, United States Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 First National closed after filing this appeal, and the FDIC was substituted as appellant after being appointed receiver of First National. See infra pp. 1154-1155
 
 
 [2]
 Although Grubb argues in his briefs that the district court erred in directing a verdict against him on his state common-law fraud claims, Grubb's counsel advised during oral argument that he had abandoned his cross-appeal
 
 
 [3]
 Specifically, First National requested remittitur based on its argument that because Weatherford Holding actually purchased the Security State stock, the damages the jury awarded to Grubb, a nonpurchaser, were too remote
 
 
 [4]
 The notice of appeal actually indicated that First National appeals from the denial of its postjudgment motions. The proper way to appeal rulings on such motions is to appeal from the entry of judgment on the verdict. See 5A J. Moore & J. Lucas, Moore's Federal Practice p 50.16, at 50-111 (2d ed. 1988). This type of appeal allows the appellant to challenge all prior nonfinal orders and all rulings that produced the judgment. 9 J. Moore, B. Ward & J. Lucas, supra, p 203.18, at 3-80
 When a party files a notice of appeal that is technically defective because it designates the appeal as from the denial of a motion for judgment n.o.v. or for new trial, we may treat the appeal as taken from the final judgment if the appeal is otherwise proper, the intent to appeal from the final judgment is clear, and the opposing party was not misled or prejudiced. See Sanabria v. United States, 437 U.S. 54, 67 n. 21, 98 S.Ct. 2170, 2181 n. 21, 57 L.Ed.2d 43 (1978); Simpson v. Norwesco, Inc., 583 F.2d 1007, 1009 n. 2 (8th Cir.1978); see also Jones v. Nelson, 484 F.2d 1165, 1168 (10th Cir.1973) (appeal not lost for "hypertechnical" reason of failing to appeal from judgment). Thus, we will treat this appeal as if First National had taken it from the entry of judgment on the jury verdict.
 
 
 [5]
 In an earlier appeal arising from this litigation, a panel of this court held that 28 U.S.C. Sec. 2408 did not entitle the FDIC to exoneration of the supersedeas bonds First National had posted before its insolvency as security for a stay of execution of the judgment of $2,722,629.88 against the bank. Grubb v. FDIC, 833 F.2d 222, 226-27 (10th Cir.1987)
 
 
 [6]
 The internal memorandum filed on February 8, 1983, by two of First National's examiners, George Ozan and Brad Krieger, characterized the state's loss projections as overly favorable "in that some of the substandard loans are actually losses within the next 90 to 180 days."
 
 
 [7]
 Rule 27.1.1 provides in pertinent part:
 A party may file a motion * * * for summary disposition only because of a supervening change of law or mootness; * * * Motions may be filed under this rule at any time, but filing within 15 days after the notice of appeal is filed is favored. Motions filed thereafter should show why filing within the initial 15 day period was impracticable.
 
 
 [8]
 In D'Oench, the Supreme Court held that the maker of a note could not assert as a defense to a suit by the FDIC on the note that the parties had a secret agreement that the note would not be enforced. 315 U.S. at 460, 62 S.Ct. at 680
 
 
 [9]
 Section 10(b) provides that it is unlawful:
 To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. Sec. 78j(b) (1982).
 Rule 10b-5 makes it unlawful:
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1988)
 
 
 [10]
 Although Grubb contends that he and the other directors of Weatherford Holding each received "a few" shares of Security State stock pursuant to state law requirements, the evidence indicates that Weatherford Holding technically purchased the shares and thereafter transferred them to the directors. Thus, Grubb cannot claim that these shares independently give him standing as a direct purchaser
 
 
 [11]
 Under this theory, only Weatherford Holding has standing to sue as a purchaser of the Security State stock. Although the holding company was named as a plaintiff in this action along with Grubb, the jury awarded it no damages
 
 
 [12]
 Rule 50(b) provides in pertinent part:
 (b) Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with the party's motion for a directed verdict.
 Fed.R.Civ.P. 50(b). The purpose of requiring a motion for directed verdict is to allow the nonmoving party the opportunity to reopen its case and present additional evidence to cure a deficiency that otherwise would have prevented the case from reaching the jury. This prevents parties from using a motion for judgment n.o.v. as a trap after losing at trial. 5A J. Moore & J. Lucas, Moore's Federal Practice p 50.08, at 50-76 to 50-77 (2d ed. 1988). The requirement also prevents the court from depriving the nonmoving party of its Seventh Amendment right to a jury trial by reexamining an issue already decided by the jury. Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 814 (3d Cir.1984), cert. denied, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).
 
 
 [13]
 The cases that Grubb cites on this point are very different in that the appellants in those cases did not raise the issue or defense at all until they filed their motions for judgment n.o.v. See Firestone Tire & Rubber, 769 F.2d at 1478; Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 171 (5th Cir.1985); Johnson, 621 F.2d at 305. Because a motion for judgment n.o.v. is simply a renewal of an earlier motion for directed verdict, these courts did not permit the appellants to challenge the denial of motion for judgment n.o.v. that raised issues never presented or ruled upon previously
 
 
 [14]
 Although being the sole shareholder of the defrauded company does not alone confer standing upon that shareholder as an individual, see Smith v. Ayres, 845 F.2d 1360, 1364 (5th Cir.1988); Crabtree Inv. v. Aztec Enter., 483 F.Supp. 211, 216 (M.D.La.1980), it may in combination with other factors justify such a conclusion
 
 
 [15]
 In Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1519 (10th Cir.1983), the Tenth Circuit approved a virtually identical instruction that referred to the Ute presumption. Zobrist, however, involved not mixed conduct, but pure misrepresentations made to one plaintiff and a pure failure to disclose material information to two other plaintiffs. Thus, the trial court correctly gave the jury alternative instructions for misrepresentations and omissions
 
 
 [16]
 The FDIC contends that First National's conduct in question constituted primarily misrepresentation in that First National did not fail to disclose that it conducted its own examination of Security State; rather, it misrepresented the actual results of the examination
 
 
 [17]
 The FDIC claims that First National's examination team left its notes in Security State's files. Grubb did not have time to search all of the files, however, and there is no indication that the notes contained the actual projections that the examiners eventually made in First National's internal memoranda
 
 
 [18]
 Because the evidence strongly supports the jury's finding of justifiable reliance under the Rule 10b-5 claim, we need not address Grubb's alternative theory that we could affirm the jury award based on the violation of the Oklahoma Securities Act, Okla.Stat. tit. 71, Secs. 101, 408 (1981), which arguably does not require proof of justifiable reliance
 
 
 [19]
 The damages awarded in the general verdict precisely equaled the sum of the capital infusions and the interest payments. Moreover, although the jury conceivably could have awarded Grubb damages for losses he claimed to have suffered from selling other properties at fire-sale prices to raise money to meet the capital calls, and for interest on the amounts of capital he contributed, these damages are even more remote than the capital infusions themselves. Because, as we determine in this section, the award based on the capital infusions cannot stand, these other more derivative damages also cannot support the verdict
 
 
 [20]
 Although First National did not specifically argue in the district court that the misrepresentations did not proximately cause the capital infusions, its motion for a new trial asserted generally that the consequential damages the jury awarded to Grubb were excessive. Moreover, Grubb has fully briefed and argued the proximate causation issue on appeal without claiming that the issue has been waived by First National and the FDIC and without asserting a need for facts in addition to those developed at trial. Thus, First National did not waive its right to appeal this issue, and we reach it as included in the motion for a new trial asserting excessiveness of damages. See Cavic v. Pioneer Astro Indus., 825 F.2d 1421, 1425 (10th Cir.1987); National Metalcrafters v. McNeil, 784 F.2d 817, 825-26 (7th Cir.1986); Yorger v. Pittsburgh Corning Corp., 733 F.2d 1215, 1223 (7th Cir.1984)
 
 
 [21]
 In the FDIC proposal, Grubb also stated that Security State hoped to offset these losses by recovering a $1.7 million claim on an employee dishonesty bond, a $12 million claim against the bank's former directors, and $700,000 in federal and state tax refunds. But Kenneth Baker, Grubb's accountant who worked on the FDIC proposal, testified that Security State officials also admitted to the FDIC that the chances of actually recovering these amounts were very slim. In the end, Security State recovered only the tax refunds